## UNITED STATES of America ex rel. Melvin ROBERSON

v.

## Lawrence ROTH.

### Civ. A. No. 75–386.

United States District Court, E. D. Pennsylvania.

May 1, 1978.

University of Pennsylvania Indigent Prisoner Litigation Program, Philadelphia, Pa., for plaintiff.

Richard A. Kraemer, Philadelphia, Pa., for defendant.

## OPINION AND ORDER

FOGEL, District Judge.

This matter comes before the Court on cross-motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff, Melvin Roberson, was incarcerated in Montgomery County Prison from August 2, 1974, until August 16, 1974. He filed this pro se action pursuant to the Civil Rights Act, 42 U.S.C. § 1983, naming as defendants Lawrence Roth, the Warden of Montgomery County Prison, together with Donald Carlin and William Anastasia, both of whom are Deputy Wardens.[1] The Court granted leave to proceed in forma pauperis and student counsel was appointed pursuant to Local Rule 9½ of the Local Rules of the United States District Court for the Eastern District of Pennsylvania.

The gravamen of plaintiff's complaint is that during the period of his confinement at Montgomery County Prison, defendants deprived him of his rights under the First,

---

1. Paul Salvati, formerly a guard at the prison, was also named as a defendant, but the action was dismissed as to him because of his current military status.

Fifth, Eighth, Eleventh, Thirteenth and Fourteenth Amendments. We find that the alleged actions of defendants did not violate any of plaintiff's Constitutional rights; accordingly, summary judgment will be granted in favor of defendants and against plaintiff.

## I. STATEMENT OF THE FACTS AND HISTORY OF THE CASE:

Plaintiff, Melvin Roberson, was transferred from Graterford Prison to Montgomery County Prison on August 2, 1974. The record shows that he was reparoled from Graterford at that time, after incarceration for a parole violation. He was transferred to the County Prison for detention, pending the imposition of sentence by the Montgomery County Court for a robbery conviction; he was assigned to a cell in the "front jail." [2] His personal belongings, including law books and papers, were taken from him, although they were returned later the same day.

Plaintiff remained in this more restrictive cell until August 5, 1974, when he was moved into the general population, or "back jail." Defendants allege that this transfer was the result of periodic administrative reviews of inmates held in custody. Plaintiff contends that he was taken before defendant Anastasia, who offered to transfer plaintiff into the general population in return for plaintiff's promise to refrain from writing writs, filing legal papers, and advising other inmates of the available legal programs at the prison. [3]

On August 8, 1974, an incident occurred between plaintiff and the guard, Paul Salvati, originally named as a defendant. According to plaintiff, he was looking into the cell of a fellow inmate when Salvati shoved him roughly to the floor. Plaintiff states that he got up without saying anything to the guard and continued on his way to the lunch room. He further alleges that while he was having his lunch, the same guard came up and shouted at him in Italian. Another inmate, who understood Italian, purportedly interpreted the phrase shouted at plaintiff as "Black Nigger."

According to Salvati, he and another guard, named Bucci, observed plaintiff walking along the corridor shouting into the small door, or wicket, on each cell and slamming the door shut. Salvati approached plaintiff, touched him lightly on the shoulder, and told him to go on to lunch. Plaintiff is alleged to have become boisterous and insulting. Later, in the lunch area, the two guards were talking to each other in Italian when plaintiff approached, insisted that he was the subject of the conversation, and that they were insulting him, and again became boisterous and insulting. Both guards made written reports of their version of the incident, and these reports were signed by plaintiff. [4]

On August 9, 1974, there was a meeting in the office of Deputy Warden Anastasia, with Anastasia, Roth, the guards, Salvati, Bucci, and plaintiff present. Again, plaintiff and defendants have different versions of the genesis of that meeting as well as its substance. According to plaintiff, the meeting occurred because he had stated to the corporal of the guard that he wanted to see the warden in order to bring assault charges against guard Salvati. According to defendants, plaintiff had caused a commotion and demanded to see the warden when he received copies of reports of the guards with respect to his conduct. Despite the different versions of the purpose and

---

**2.** Although not mentioned in the original complaint, the plaintiff's subsequent affidavit contends that he was originally assigned to the general prison population or "back jail," upon his arrival, but that such orders were countermanded by defendant Carlin following an alleged argument over the prison's refusal to give the plaintiff a receipt for those personal belongings which were taken from him upon his arrival at the County prison.

It is clear on this record that detention in the front jail is more restrictive than the general population.

**3.** The plaintiff stated that he refused to honor these conditions, but does not explain why the transfer was effected.

**4.** The plaintiff contends that he signed these reports after being assigned to the front jail on August 9, 1974, and was not given copies.

content of the meeting, both sides agree that the meeting terminated when defendant Anastasia informed plaintiff that he would be transferred back to the front jail for his protection and that a guard would be assigned to protect plaintiff when he left the cell. This procedure was enforced throughout the remainder of this time period, even though plaintiff had not requested such protection.

Plaintiff has presented copies of two request slips, one dated August 9, 1974, addressed to defendant Anastasia, and one dated August 14, 1974, addressed to defendant Roth. These slips request that charges be lodged against Salvati and that plaintiff be released to the general prison population or given a hearing. According to the normal prison procedure, as testified to by defendant Anastasia, an inmate in administrative detention would receive a hearing after submitting such a request slip.[5]

Additionally, plaintiff alleges that the assignment of a guard to him resulted in the guard remaining present on two occasions while he attempted to speak with an attorney or a law student intern prior to his sentencing.

## II. MINOR CLAIMS:

Many of plaintiff's complaints can be dismissed summarily, such as his contention that his personal possessions were seized upon his arrival. Plaintiff testified to the contrary when his deposition was taken, stating that all of his belongings were returned to him before the end of the same day. Therefore, we find nothing violative of plaintiff's rights in the prison authorities' practice of examining a transfer prisoner's belongings upon arrival.

Another frivolous allegation of plaintiff is that he was not provided with

material to clean his cell. Again, however, his deposition testimony revealed that the same cleaning materials were available to him as were available to other front jail prisoners and that his cell mates had cleaned the cell during the period in question.

Plaintiff also complains that the window frame was missing from his cell, thus exposing him to the elements. He stated, however, that he made no complaint to the prison authorities about this problem.

Plaintiff also claims that being held in the front jail infringed his First Amendment rights, in that he was unable to mingle freely with the general prison population, could not advise other inmates on legal matters or receive books or other reading material from other inmates. Whether or not these claims would prove to be factually correct (they are generally denied by defendants), we find them to be wholly without merit as to a prisoner held in tighter security than the general prison population.

Plaintiff further alleges that his Sixth Amendment right to counsel was violated by the presence of a prison guard in the interview cell during his conversation with his attorney. Under the facts of this case we do not find any such violation. Plaintiff testified at his deposition that although he was being held awaiting sentence, these legal interviews were for other purposes.[6] The record reveals that plaintiff discussed his pending sentencing with counsel on several occasions, and, further, establishes that there is no evidence that a formal complaint has been made by plaintiff or his counsel as a result of either incident.

## III. SEGREGATED CONFINEMENT:

The major thrust of plaintiff's complaint is that his placement in the front jail

---

5. We note that the copies produced by plaintiff do not evidence receipt by any member of the prison staff, although the prison rules state that such a signature is required.

6. The record discloses that these interviews were initiated by the attorneys involved, one as a routine screening, and one by an attorney interested in interviewing plaintiff in connection with plaintiff's membership in the Montgomery County Criminal Justice Forum.

from August 2, 1974, until August 5, 1974, and again from August 9, 1974, until August 16, 1974, amounted to segregated confinement, thus denying him his due process rights because there was not a hearing as required by *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

Plaintiff had been incarcerated at Montgomery County Prison prior to the time period involved in the matter, and had been active in various reform movements.[7] He suggests that the allegedly improper treatment to which he was subjected was motivated by resentment over his reform activities.

In *Wolff, supra,* the Supreme Court reviewed the actions of prison officials and found that due process standards apply to some prison disciplinary proceedings. In that case the prisoners had earned good time credits pursuant to Nebraska state law, and the discipline involved the cancellation of these credits without a hearing which met due process standards. However, in later cases in which prisoners had been transferred to other facilities without a hearing, the Court found that the prisoners had no state-created right to remain at any institution, and held that such transfers were within the discretion of the prison officials. *See Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), and *Montanye v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976). In *Montanye,* the degree of confinement remained the same, i. e., the prisoner was transferred from a maximum security institution to a maximum security institution. In *Meachum,* however, the prisoner was transferred from a medium security institution to a maximum security institution.[8]

Based on the record before us, plaintiff has not shown that the transfers involved were disciplinary, and if he had, it would not be clear that the full requirements of *Wolff* would apply.[9]

Furthermore, plaintiff has not established any state-created right to the same level of restriction as that of the general population, the deprivation of which would amount to a liberty interest to be protected by the Due Process Clause. The Supreme Court in *Meachum* specifically refused to go so far as to require a hearing before any transfer which " . . . would place the prisoner in substantially more burdensome conditions than he had been experiencing." 427 U.S. at 225, 96 S.Ct. at 2538. The record before us establishes that Pennsylvania prison officials, like the Massachusetts officials in *Meachum,* have the discretion to transfer prisoners for any number of reasons, and this discretion is not limited to instances of serious misconduct. This Court neither has the right nor the capacity to supervise the day-to-day management of state prisons by dictating the manner in which the *discretionary* functions of prison officials should be dispatched. Such an intrusion is unwarranted, and would be a bold usurpation of power by the Court.

Accordingly, an Order will be entered granting summary judgment in favor of the defendants and against plaintiff.

---

7. The record indicates that plaintiff was previously incarcerated at Montgomery County Prison from May 1973, until September 1974. During this time he was active in the Montgomery County Criminal Justice Forum and attended a conference on prison conditions at Sugar Loaf in 1973.

8. Moreover, in *Meachum* one of the respondents, Royce, was placed in administrative segregation for 30 days within the same institution upon the disciplinary board's recommendation,

so the Court was faced with both *intra* as well as *inter-* prison transfers.

9. The Supreme Court in *Baxter v. Palmigiano,* 418 U.S. 908, 94 S.Ct. 3200, 41 L.Ed.2d 1155 (1976), reaffirmed that the due process requirements were not violated when "lesser penalties" were involved, and reversed the requirements enunciated by the Ninth Circuit as premature.