Charles COBB et al.

v.

Louis S. AYTCH et al.

Civ. A. No. 73–1290.

United States District Court, E. D. Pennsylvania.

Jan. 29, 1979.

Elliot B. Platt, Community Legal Services, Philadelphia, Pa., for plaintiffs.

Mark N. Cohen, Philadelphia, Pa., for State defendants.

James M. Penny, Jr., Philadelphia, Pa., for City defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWCOMER, District Judge.

Plaintiffs instituted this class action alleging that defendants violated their constitutional rights by transferring them from Philadelphia County prisons to the penal institutions of the Commonwealth of Pennsylvania. The case was tried to the Court and, after due consideration, and pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court makes the following findings of fact and conclusions of law.

FINDINGS OF FACT

1. Charles Cobb, James S. Glover, Daryl X (Jackson), Michael Jordan, Gregory Martinez, and Jeffrey X (Robinson) are the original plaintiffs in this action. After the original action was filed, Edward Engel-

freid and Joseph Vines were permitted to intervene as plaintiffs.

2. The named plaintiffs brought the action on behalf of themselves and all other persons incarcerated in Philadelphia County prisons on May 31, 1973, and all inmates subsequently incarcerated therein who were transferred against their will or in the future might be transferred against their will to Pennsylvania penal institutions pursuant to 61 P.S. § 72. Under Rule 23(b)(2) of the Federal Rules of Civil Procedure, the Court certified the class on January 23, 1974.

3. Defendants are two officials of the Commonwealth of Pennsylvania—the Attorney General and the Commissioner of Corrections—and three officials of the City of Philadelphia—the Superintendent of the Philadelphia County Prisons, the District Attorney and the Commissioner of Police. The successors in office of various defendants have been substituted as party defendants.

4. There are three Philadelphia County prisons: Holmesburg Prison, located at 8215 Torresdale Avenue, Philadelphia; The House of Correction, located at 8001 State Road, Philadelphia, Pennsylvania; and the Philadelphia Detention Center, located at 8201 State Road, Philadelphia, Pennsylvania.

5. Incarcerated within these institutions are three major classes of inmates: (i) pretrial detainees who are unconvicted and held for trial; (ii) unsentenced persons who are convicted and awaiting sentence; and (iii) sentenced persons.

6. In early 1973, the Philadelphia prisons were substantially overcrowded and the population exceeded the prisons' operational capacity of 1,950.

7. Representatives of the Philadelphia criminal justice system, including the President Judge of the Philadelphia Court of Common Pleas, the Superintendent of Philadelphia County prisons and members of the District Attorney's office, met to discuss the overcrowding situation. Staff members of the Philadelphia County prisons recommended that certain categories of offenders be transferred to state institutions to reduce the population; those categories were unsentenced inmates, parole violators, and sentenced prisoners with either six or more months remaining on their minimum sentence or additional state sentences to serve. Between mid-April and early May, 1973 a list of unsentenced inmates who the prison authorities proposed to transfer was submitted to the President Judge for review and evaluation. No action was taken on that proposed transfer list in May of 1973.

8. Even though the Philadelphia County prisons were overcrowded in 1973, inmates could move freely in their cellblocks, shower at any time, watch television until 11:00 p.m., eat in the dining hall, watch movies in an auditorium or on the block and occasionally attend shows presented by outside entertainers. In addition, a variety of educational and organizational programs were available to them.

9. In May, 1973, Holmesburg Prison's population exceeded its design capacity by more than 450. Although not confronted by serious security problems that month, the prison officials ordered a search of the institution's inmates and cells which disclosed ninety-nine items that could have been used as weapons.

10. About that time, Holmesburg correctional officers learned from their own observations and inmates' statements that dissension existed within the Orthodox Muslim inmate group and that inmate Joseph Bowen had assumed the sect's leadership position. Unlike the previous leader Lee Jenkins, Bowen was reputed to believe that violence was a legitimate means for causing change and an appropriate method to apply in practicing religion. The prison authorities believed that the leadership change was not accomplished through totally peaceful means. An inmate, Samuel Hutchings, had reported to Correctional Officers Clegg and Gentile that he was beaten by Bowen and other Orthodox Muslims on May 25, 1973, because they wanted to persuade him to follow Bowen rather than Jenkins. Also that same night, Bowen and his followers

threatened Jenkins with harm; Officer Clegg ordered the group to disperse. Bowen's followers numbered close to twenty-eight and twelve of them lived on "I" Block with him.

11. Tension arose not only within the Orthodox Muslim group, but also between the Orthodox Muslims that followed Bowen and Holmesburg Prison authorities. Bowen sought to use a storage room on "I" Block for a private prayer room where the group's activities would not be visible to correctional authorities. Deputy Warden Robert F. Fromhold thought such a room would create a security risk and refused the request. On several occasions, the Deputy Warden and Bowen were heard to argue loudly on this subject.

12. On May 31, 1973, Patrick N. Curran, Warden of Holmesburg Prison, and Deputy Warden Robert F. Fromhold were murdered and Captain Leroy Taylor was stabbed and seriously wounded. Bowen and another Orthodox Muslim, Frederick Burton, had requested to see the Deputy Warden about the prayer room. Approximately one minute after they were admitted, Captain Taylor heard calls for help. Upon entering he saw the two inmates stabbing the officers; he tried to stop them, and was stabbed himself. Bowen and Burton alone were charged with the killings.

13. The Deputy Superintendent of the Philadelphia County prisons, Edmund Lyons, was in his office at the Detention Center when he learned of the stabbings. He immediately went to Holmesburg Prison and, upon arrival, assumed control as senior prison official at the scene. He ordered the institution secured and all inmates locked in their cells.

14. Captain Thomas McCaffrey told Lyons about the prior incidents involving the Orthodox Muslims and the recent power struggle within that group. Other correctional officers and members of the police force supplied Lyons with additional information, including that which indicated that some Orthodox Muslims on "I" Block might have been planning to instigate additional trouble to show their support of Burton and Bowen. Lyons also knew that other tensions existed between certain inmate factions and the correctional staff at Holmesburg which led him to conclude that the institution was a "powderkeg." In addition, he had reason to believe that some inmates sought revenge on the Orthodox Muslims because of the trouble that Bowen and Burton had caused.

15. On the same day as the murders, Lyons decided to recommend to Louis S. Aytch, the Superintendent of the Philadelphia County prisons, that the ten or twelve inmates who were closely allied with and followers of Burton and Bowen on "I" Block be transferred to the Detention Center. He believed that the transfers would serve the institution's interest in security and the affected inmates' interest in safety. The transfer decision was not based upon these inmates' religion, but rather upon their association with Burton and Bowen.

16. Agreeing with Lyons' recommendation, on May 31, 1973, Superintendent Aytch, ordered a certain twelve Orthodox Muslims on "I" Block transferred to the Detention Center. Aytch and Lyons thought the inmates were associated with Burton and Bowen. Upon Aytch's request, within forty-eight hours, these individuals were then transferred to state correctional facilities. The Superintendent had asked Phillip Bannan, Deputy Commissioner of Corrections for the Commonwealth of Pennsylvania, to accommodate these individuals in state facilities. Aytch sought these transfers because he believed that these individuals would be safer in the state institutions and that the Philadelphia institutions would be more secure without them. His action was based upon their association with the suspected murderers and not on their religious beliefs. However, the transfers to the Commonwealth facilities were made without the approval of the Court of Common Pleas.

17. Aytch also decided to reduce the number of inmates in Philadelphia institutions by transferring some of them to state facilities. Due to the emergency situation created by the Holmesburg murders, Aytch

had ample reason to believe that the Philadelphia County prison situation was explosive and that decreasing the prison population would be a means to defuse that situation. He directed the preparation of two types of transfer lists.

18. First, on May 31, 1973, Aytch instructed Thomas Nesbitt, then Acting Chief Registrar of the Philadelphia County prison system, to compile a list of unsentenced prisoners whose names could be sent to the Court as persons proposed for transfer to state facilities. Nesbitt prepared a list of approximately 110 unsentenced prisoners.

19. Second, on June 1, 1973, Aytch instructed several members of his staff to prepare a list of individuals who were disruptive to the normal operation of the institutions. By ordering this list he did not mean to punish these individuals. In seeking clarification of his instructions, David Owens, then a lieutenant in the Executive Office, asked whether this list should include the Muslims in the institutions and Aytch responded affirmatively. As Aytch explained at trial, and as this Court finds, by this comment he did not mean to direct Owens to place all Muslims on the list, but rather to include Muslims who also were disruptive to the prisons.

20. Owens interpreted Aytch's instructions to mean that he was to compile a list of troublemakers. Troublemakers included both inmates guilty of disciplinary infractions and inmates who created or caused any problems in the institution. To Owens, in fact, troublemakers specifically included those inmates who officers knew caused problems, but against whom they could not obtain sufficient evidence to file formal charges. And with reference to the Muslims, Owens understood Aytch to mean that even though some troublemakers who were Muslims were already isolated from the population, they too should be transferred.

21. Owens sought to compile a list at Holmesburg. He directed the housing officers to list those individuals who were disruptive to the institution. The officers were not instructed to distinguish between untried, unsentenced and sentenced inmates. Owens gave the same instructions to the housing officer of "D" Block, which he knew housed many "troublemakers" who were Muslim. The only block from which he did not seek a list was the psychiatric block. After receiving the housing officers' lists, he went through them and deleted the names of persons who he knew had medical problems. He then composed a master list which he submitted to Superintendent Aytch.

22. Edward M. Forman, then Acting Warden at the House of Correction, was also instructed to compile a transfer list. He was told to include sentenced inmates, unsentenced inmates and other persons who posed security problems. He understood that when reporting inmates with security problems he was not limited to including only those who were found guilty of misconduct charges.

23. In 1973 and today, maximum security facilities exist in Philadelphia prisons for inmates who present security problems.

24. A final transfer list of 287 inmates was prepared. Listed were 150 untried inmates, 101 inmates who were unsentenced, 25 sentenced prisoners, 5 held for the Pennsylvania Parole Board, 4 held for the United States Marshal, 1 held for another jurisdiction and 1 serving back time.

25. Of the 287 inmates, 28 were housed in the House of Correction, 173 in Holmesburg and 86 in the Detention Center.

26. Only 24 of the 287 inmates listed had a record of inmate misconducts resulting in disciplinary action.

27. A record of the inmates incarcerated in Philadelphia County prisons on June 8, 1973, shows that 445 were sentenced and 2,167 were awaiting trial. Although a few transfers occurred before that date, the bulk of the transfers took place after that time and therefore, as it is the only day for which statistical data of this kind has been made available, the Court views it as a representative day prior to the vast majority of the transfers and after the Holmesburg murders. The number of sentenced inmates, then, exceeded the total number of

inmates that the City sought to transfer by 158. In addition, the record discloses that the number of sentenced inmates in Holmesburg, the House of Correction and the Detention Center surpassed the number of persons proposed for transfer from each institution. Therefore, defendants have not shown that it was necessary to transfer untried inmates to reduce the prison population. Nor have they established that the security needs of the prison could not be met by placing untried troublemakers in more restrictive confinement in Philadelphia.

28. Although a number of Black and Orthodox Muslims were included on the list, that number has not been established; moreover, it has not been shown that that number was disproportionate to the number of Black and Orthodox Muslims in the Philadelphia County prisons at that time.

29. On or about June 6, 1973, the defendant Aytch transmitted a Petition for Transfer of 287 names to the Court of Common Pleas, Philadelphia County. Pursuant to Pennsylvania 61 P.S. § 72, the petition was filed and acted on *ex parte,* with no notice to the inmates affected or opportunity for them to be heard.

30. On or about June 7, 1973, the Honorable D. Donald Jamieson, then President Judge of the Philadelphia Court of Common Pleas, approved the Petition, after deleting the names of 50 inmates with pending court dates. Of the 232 inmates whose names remained, 115 were pretrial detainees, 82 unsentenced, 25 sentenced, 4 held for the Pennsylvania Parole Board, 4 held for the United States Marshal, 1 held for another jurisdiction and 1 serving back time.

31. In mid- and late June 1973, 123 inmates were transferred to state correctional facilities pursuant to the petition. In later months, 2 more inmates were transferred.

32. The transfers were made without any prior notice to the inmates involved, their attorneys or families. The transferred inmates were not afforded an opportunity for a hearing. Their attorneys were notified of the transfers shortly after they occurred.

33. The transferees were placed in five different state correctional institutions. These institutions and their distances from Philadelphia are:

(i) State Correctional Institution at Huntingdon–220 miles;

(ii) State Correctional Institution at Dallas–120 miles;

(iii) State Correctional Institution at Pittsburgh–300 miles;

(iv) State Correctional Institution at Rockview–201 miles;

(v) State Correctional Institution at Camp Hill–90 miles.

34. Because of overcrowding, no inmate was transferred to the State Correctional Institution at Graterford which is the state prison closest to Philadelphia.

35. At the state institutions, the transferees lost the freedom of movement that they had in Philadelphia County facilities. They were placed in several types of more restrictive confinement. Some inmates were housed in maximum security, often not permitted out of their cells at all; they stayed in maximum security for periods ranging from three to four days to the entire time at the state prison. Other inmates were placed in quarantine, for all or part of their stays in the state facility, where they would be allowed to leave their cells for meals and two hours of recreation per day on the cell- block. And another group was placed in a cellblock where they were permitted out of their cells for most of the day and given yard and recreational privileges.

36. In making housing assignments, state officials did not distinguish between inmates on the basis of trial status; inmates held for trial, unsentenced inmates and sentenced prisoners were all placed in the housing conditions as described in Finding 35.

37. A transferee's release from maximum security or quarantine confinement was often conditioned upon his accepting an institutional job. This condition was applied equally to untried, unsentenced and sentenced inmates.

38. Some of the housing facilities at the State Correctional Institution at Rockview were filthy and birds flew around some of the cellblocks in which the transferees were housed. Often hot and cold water was unavailable and only one shower a week was permitted. Transferees may have experienced these conditions for a substantial period of time, i. e. from one week to several months.

39. Generally, institutional programs were unavailable to transferees and in several instances the transfer caused inmates to forego educational programs that they participated in while incarcerated in Philadelphia.

40. The mail privileges of at least some of the transferees were restricted in state institutions. At some prisons, transferees could not write to inmates in county prisons and incoming mail was read by prison officials. One inmate's letter was returned to him before it was mailed.

41. Although many transferees received weekly visits from family and friends while incarcerated in Philadelphia, such visits generally terminated when they were transferred to state facilities. Presumably, the drastic reduction in visits was occasioned by the increase in distance between the homes of the visitors and the state facilities.

42. For various reasons, on several occasions, transferees missed court appearances and parole hearings when they were not returned to Philadelphia on time. In fact, during one eight to ten week period, 25% of the transferees' cases had to be continued because defendants were not brought to court. Due to continuances and the prolongation of the pretrial period, some inmates spent more time in pretrial incarceration than the eventual length of their sentence.

43. During the same period of time, inmates incarcerated in Philadelphia County prisons missed Philadelphia County court appearances in only 3 to 4 percent of their cases.

44. The Defender Association of Philadelphia represents approximately 80% of the incarcerated defendants in Philadelphia County prisons. Prior to trial, the assistant defender representing a defendant goes to the prison and interviews the defendant with respect to his background, the facts of the case, possible witnesses and psychiatric services; he also discusses the possible outcome with the defendant. These interviews are essential to the defendant's defense as they allow the attorney to develop the necessary attorney-client relationship and to prepare the case.

45. Most inmates who were transferred in 1973 and represented by the Defender Association were deprived of these pretrial interviews. Because of the distances between the state institutions and Philadelphia and the increase in costs and time in making visits to state institutions, the assistant defenders were unable to conduct pretrial interviews with most transferees.

46. It is often necessary for defender attorneys to interview their clients at the post-trial stage in order to prepare for sentencing. However, rather than holding these interviews at the prison, it is possible to conduct them immediately after the defendant is convicted or enters his plea and prior to the inmate's return to prison. Therefore, the transfer of Philadelphia inmates to state institutions should not deny these inmates the opportunity to adequately prepare for sentencing.

47. The evidence did not establish that previously sentenced inmates served additional time because of the transfers. Although the plaintiffs contended that at least two inmates, Harry Horne and Bernard Sampson, were incarcerated beyond the length of their sentence, the evidence presented did not prove this claim; bald assertions of a confusing nature are insufficient.

48. In October, 1973, the defendant Aytch attempted to transfer two other inmates to the state system, Daryl Jackson and Jeffrey Robinson. On the transmittal form sent to the state by the county officials, the reason noted for transfer was "security risk." Although Robinson and Jackson had testified in actions against city officials after June, 1973, the plaintiffs

have not shown that defendant Aytch or his agents sought to punish these inmates for participating in court actions by attempting to transfer them. Jackson and Robinson's names were included on the list submitted in June, 1973, for transfer and, from the limited evidence presented on this issue, the Court cannot conclude that transfers were made to discourage or punish participation in court activities.

49. Many of the transferees were eventually returned to Philadelphia prisons.

50. After 1973, defendant Aytch continued, although in much smaller numbers, to transfer inmates to the state facilities where they were accepted by the state officials. Unsentenced, as well as sentenced, inmates have been transferred in the recent past. As late as May, 1977, the City submitted a petition for the transfer of 150 sentenced inmates. Of these, 54 were accepted by the state and the remainder were rejected.

51. It is not defendants' policy to solicit volunteers for transfer.

52. Although not part of statute or regulation, the state prison authorities have formulated a procedure that the counties must follow in seeking inmate transfers. A memorandum of January 24, 1977, authored by Harry E. Wilson, Director of Special Services for the Pennsylvania Bureau of Correction, describes the procedures that must be taken by a warden seeking to transfer a county inmate. First, the warden must complete a Petition for Transfer form and include a short narrative indicating the reasons for the sought transfer and any special conditions of which the state facility should be aware. Second, a hearing must be afforded untried and unsentenced inmates whom the county seeks to transfer; the hearing must be given by the transferring institution. Third, after the Pennsylvania Bureau of Correction approves the transfer, the petition must be submitted to the county judge for his or her approval. Although this procedure existed at the time of trial, there is no assurance that it will not be altered by the state officials.

53. As of April 7, 1977, the policy of the Bureau of Correction was to afford an untried or unsentenced inmate a housing hearing upon his arrival at the state institution. The hearing was to be held on at least 24 hours notice to the inmate.

54. The policy of the Pennsylvania Bureau of Correction, as of trial, was to place sentenced transferees in the state institution closest to the county from which they were transferred. Consequently, Philadelphia sentenced inmates transferred to state institutions should be assigned to the State Correctional Institution at Graterford. There the sentenced transferee would be treated as any other state prisoner in Graterford.

55. The present restrictions placed on an untried or unsentenced transferee's freedom in the state institution vary depending upon the institution and the security risks posed by the particular inmate. However, generally, inmates are confined to their cells for most of the day, and are usually allowed to go out for meals and exercise. It is the policy of the Bureau of Correction that untried and unsentenced transferees are not forced or permitted to work. Institutional programs are not available to these inmates.

56. Conditions in Philadelphia County prisons today remain as described above in Finding 8. Clearly, then, inmates face more restrictive confinement when transferred to state facilities than they experience in Philadelphia County prisons.

57. The Defender Association of Philadelphia lacks the resources to conduct attorney-client interviews at the state institutions and therefore a transfer of a pretrial detainee today would impose the same burden on that inmate as it would in 1973 with respect to preparation for trial.

58. From June, 1973, to March, 1977, the population in the Philadelphia prisons remained constant, even when the consent decree previously entered in this case restricted the Philadelphia prison's ability to transfer inmates. Population data for the period after March 1977 was not presented to the Court.

59. At trial, evidence was submitted only as to the claims of Engelfried and Vines; there was no evidence presented as to the claims of the other named plaintiffs. In June 1973, Engelfried and Vines were detained at Holmesburg in a pretrial status. Pursuant to the transfer petition, they were transferred to Rockview.

60. At the time of trial, Edward Engelfried was no longer incarcerated and Joseph Vines was incarcerated at Graterford pursuant to a conviction and sentence. The evidence presented at trial did not establish that any of the named or intervening plaintiffs currently are in a Philadelphia County prison or otherwise subject to a transfer from a Philadelphia County prison to a state facility.

61. Although the Philadelphia Police Department helped the Philadelphia County prison officials secure the prisons in 1973, after the Holmesburg murders, plaintiffs have not established that the Police Department was involved in the subsequent transfers or the transfers that can take place today.

62. Nor have plaintiffs shown that the District Attorney of the City of Philadelphia was involved or is involved in securing inmate transfers in 1973 or today.

## DISCUSSION

Although the murders at Holmesburg were unusual, to prisons and prisoner rights' lawsuits, the tensions characterizing their aftermath are not. The tensions that developed in May, 1973, between inmates and staff, inmates and inmates, and staff and staff remain to some degree in penal institutions today and, when courts are faced with a challenge to prison officials' action, they too must be concerned with these tensions. But these tensions are not the only ones the courts must consider, because also critical are those that exist between the restrictions inherent in institutional confinement and the freedoms that inmates retain.

These tensions play an important part in the issues raised in this case and their resolution. The Court is called on to balance them and is reminded that, while it is not the federal courts' role to replace the judgment of prison officials with its own, *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977), it must carefully safeguard the rights that survive incarceration. *Gray v. Creamer*, 465 F.2d 179 (3d Cir. 1972).

On behalf of the class they represent, plaintiffs have put forth various claims stemming from the 1973 transfers. They allege that:

(1) in violation of the First and Fourteenth Amendments, certain Black and Orthodox Muslim class members suffered religious discrimination in that the transfers were motivated by religious considerations;

(2) the rights of sentenced inmates were infringed by the failure to afforded these inmates due process hearings prior to their transfer and by the confinement of these inmates upon transfer in cruel and unusual conditions;

(3) the transfers violated pretrial detainees' rights to substantive and procedural due process; and

(4) unsentenced inmates were denied substantive and procedural due process as a result of the transfers.

Plaintiffs seek declaratory and injunctive relief for the violations alleged and future transfers.

For reasons elaborated below, the Court finds that plaintiffs have proven that the rights of pretrial detainees were violated by the transfers; on the other hand, they have not succeeded in establishing their religious discrimination claim or the claims of unsentenced and sentenced prisoners. However, before discussing the merits of these claims, it is necessary to turn to a preliminary issue raised by defendants as to whether this action is moot.

## I. MOOTNESS

The facts underlying this action arose nearly six years ago. Since then conditions in the prisons and the policies toward trans-

fers have changed; moreover, none of the named plaintiffs in this action remains subject to a transfer from a Philadelphia County prison to a state penal institution. In light of these circumstances, defendants argue that the case is "moot" and the Court is without power to resolve the issues or give relief.

Three distinct, but somewhat related, issues are raised by defendants. First there is the question of what effect the mooting of the named plaintiffs' claims has on the claims of the class. The second issue is whether the claims have become mooted by reason of changes in County and Commonwealth policies. And finally, the question remains whether, if the claims are not moot, injunctive relief is appropriate in light of changed circumstances.

▆▆ Turning to the first issue, clearly the claims of the active[1] named plaintiffs are moot. Although once incarcerated in Philadelphia County jails and transferred to state facilities, these persons are no longer subject to such a transfer as they are not in custody of the Philadelphia County prisons. They have no present "interest" in the transfer policy and therefore the issues are moot as to them. *Weinstein v. Bradford*, 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975); *Holt v. Moore*, 541 F.2d 460 (4th Cir. 1976). Nonetheless, the claims of the class are not.

In certain situations, claims of the class survive the mooting of the named plaintiff's claims. *See, e.g., Franks v. Bowman Transportation Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); *Sosna v. Iowa*, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975). Such a case is this one where unless the class claims continue it is unlikely that the issues raised will ever be resolved. Here, the named plaintiffs are inmates and the length of their incarceration in Philadelphia jails is at best unpredictable and, with regard to pretrial detainees, one would hope short. It very well might be impossi-

ble to resolve the issues raised herein within an inmate's term of confinement in the Philadelphia County prisons. Therefore, if these issues are to be heard by the courts, the class must be given the opportunity to proceed even though the named plaintiffs' claims are no longer alive. This case presents a situation analogous to the one in *Sosna v. Iowa, supra,* and there the Supreme Court held that in a class action challenging durational residency requirements the action could continue even though the named plaintiff's claim had become moot when she eventually, simply because of the passage of time, satisfied the residency requirement; the Court recognized the strong need for allowing the class claims to proceed. Defendants argue, though, that the recent decision in *Kremens v. Bartley*, 431 U.S. 119, 97 S.Ct. 1709, 52 L.Ed.2d 184 (1977), requires a different result than the one reached here. The Court disagrees. In *Kremens*, the Supreme Court refused to allow a class action to proceed once a change in law mooted the claims of the named plaintiff and a large segment of the class; it recognized that the necessity for allowing the class to proceed was not presented and that this was a different and distinguishable case from *Sosna* where "mootness was due to the inexorable passage of time, rather than to any change in the law." *Id.* at 131, 97 S.Ct. at 1716. Finding this case to be like the one presented in *Sosna*, this Court believes its principles apply and holds that the claims of the class are not moot as a result of the mooting of the named plaintiffs' claims.

▆▆ The second mootness question demands an answer based upon facts and law. The defendants contend that because of changes in both transfer policies and institutional conditions the plaintiffs' claims are moot and need not be resolved by the Court. The changes in the transfer policies as found in Findings 52 and 53 are not embodied in state regulations and defendants are

---

1. Of the named and intervening plaintiffs, at trial evidence was presented only as to the status of Edward Engelfreid and Joseph Vines. The remaining named plaintiffs did not testify at trial or present evidence as to their present situation; therefore, the Court will consider their claims both inactive and moot.

free to alter them. Similarly, the physical conditions in state institutions may change. For subsequent events to render a case moot, the defendants must show that the allegedly wrongful behavior reasonably cannot be expected to recur. *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968). And when the change in circumstances results from voluntary action which the defendant is free to change, the defendant has not carried its burden. *United States v. W. T. Grant*, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); *Zurak v. Regan*, 550 F.2d 86 (2d Cir. 1977), *cert. denied*, 433 U.S. 914, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977). Surely, in this case the controversy cannot be deemed moot as the actions complained of are capable of repetition. *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1910).

The third "mootness" issue is not really one of mootness; rather, it is one of whether injunctive relief is appropriate in this case. The defendants ask whether the plaintiffs are threatened by any cognizable danger which would make injunctive relief appropriate. Whatever the answer to this query, it can best be determined after the Court determines what, if any, rights have been violated. *United States v. W. T. Grant, supra.* Therefore, the Court will reserve discussion on this issue until after the substantive issues are addressed.

## II. CLAIMS BASED UPON RELIGIOUS DISCRIMINATION

 Plaintiffs allege that certain 1973 transfers were acts of religious discrimination of which Orthodox and Black Muslims were the victims. On the heals of the Holmesburg murders, twelve Orthodox Muslims were transferred. And when the larger transfer list was to be compiled, Superintendent Aytch instructed his officers to include Muslim troublemakers; muslims were on the final list.

The religious freedom guaranteed by the First and Fourteenth Amendment which survives incarceration must be protected by the federal courts. *Cruz v. Beto*, 405 U.S.

319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); *O'Malley v. Brierley*, 477 F.2d 785 (3d Cir. 1973). Nonetheless, the transfers that affected Orthodox Muslims and Black Muslims in this case were not acts of religious discrimination, but only the results of the unfortunate events at Holmesburg.

The twelve Orthodox Muslims were transferred because of their association with Bowen and Burton. They lived on the same cell block and had intensive, though sometimes adversarial, dealings with the two murderers. The plaintiffs have not presented sufficient evidence to prove that religion, rather than association, guided the decision of the prison officials.

And as to the Black Muslims, again, the evidence does not support plaintiffs' claims. Certainly, the transfer list included Black Muslims, but no evidence was presented indicating that Black Muslims were included in such large numbers as to render the prison officials' actions suspect. *Id.* Nor were other circumstances shown to exist which would cause one to question the officials' motivation. Although, as noted in Finding 19, Aytch instructed Owens to include Muslin troublemakers on the transfer list, he did so to insure that all troublemakers, even those who happened to be Muslim, would be listed. His effort to treat Muslim troublemakers like other troublemakers cannot be viewed as an act of discrimination.

## III. THE CLAIMS OF SENTENCED TRANSFEREES

### A. *The Res Judicata Issue*

Before reaching the merits of the sentenced transferees' claims, it is necessary to address a res judicata issue raised by defendants. Defendants contend that the sentenced class members are precluded from challenging the 1973 transfer of inmates because of a prior decision of the Philadelphia Court of Common Pleas.

In April, 1972, the City of Philadelphia petitioned the Court of Common Pleas seeking its approval of inmate transfers. The action was captioned *In re Petition of City of Philadelphia*, April Term, 1972, No. 2634.

On behalf of a class of sentenced inmates, an intervention motion was filed. The Court of Common Pleas denied the motion, stating that the inmates had no standing to intervene in a petition to transfer action because a sentenced prisoner had no right to choose his or her place of incarceration. The defendants claim that the 1972 decision of the Court of Common Pleas binds the sentenced inmates in this case.

The class named in the intervention petition was described therein as the "class of plaintiffs in the case of *Jackson, et al. v. Hendrick, et al.*, February Term, 1971, No. 2437." *Jackson* was a 1971 action where conditions in the Philadelphia prisons were challenged; the class in the case was all "persons who [were then] incarcerated in the Holmesburg Prison, Eastern State Penitentiary and other facilities [then] used to house prisoners and/or detentioners by the Philadelphia prison authorities."

There appears to be several reasons why the denial of intervention in *In re City of Philadelphia* does not have a res judicata effect on the claims of any sentenced class members here. But without even turning to the merits of the issue, the Court finds that the defendants waived any res judicata defense they might have had by not asserting it in their answer.[2] Under Rule 8(c) of the Federal Rules of Civil Procedure, a defendant is required to affirmatively plead a res judicata defense and failure to do so results in its forced waiver. *Trio Process Corp. v. L. Goldstein's Sons, Inc.*, 461 F.2d 66 (3d Cir.), *cert. denied*, 409 U.S. 997, 93 S.Ct. 319, 34 L.Ed.2d 262 (1972); *Griffenhagen-Kroeger, Inc. v. City of Philadelphia*, 432 F.Supp. 63 (E.D.Pa. 1977). Although there may be instances when the rule is relaxed, the Court does not consider this to be an appropriate one to do so since the defense was first raised at trial and after plaintiffs prepared this case. To allow such relaxation now would prejudice the plaintiffs' and not be in the interest of fairness. *Jakobsen v. Massachusetts Port Authority*, 520 F.2d 810 (1st Cir. 1975).

### B. *Due Process Hearings Prior to Transfer*

In 1973, prior to the transfers, sentenced inmates were not afforded notice of the transfers or the opportunity for a hearing in which they could contest their change in place of confinement. Today, in fact, such procedural protections are not established by regulation or statute and generally are not provided to sentenced inmates who are

---

**2.** If the Court were to reach the merits of the res judicata issue, it would resolve a question that involved only a small segment of the sentenced inmate class. In this case, a class was certified "on behalf of all inmates who were incarcerated in Philadelphia County detention facilities as of May 31, 1973 and all inmates subsequently incarcerated in Philadelphia County facilities . . .". The sentenced inmates included in this class, then, are not only those incarcerated at the time of the *Jackson v. Hendricks* matter but also those held in Philadelphia facilities after 1971. As the intervention petition in the 1972 Common Pleas action was filed on behalf of the class in *Jackson*, it could only preclude those inmates incarcerated in 1971.

With regard to them, the decision denying intervention does not appear to be a judgment that has res judicata effect. The motion to intervene was made under Rule 2327(4) of the Pennsylvania Rules of Civil Procedure which permits intervention if the determination of the action may affect any legally enforceable interest of the person seeking intervention whether or not that person would be bound by the judgment in the action. In Pennsylvania the decision of whether to permit intervention under Section 4 is one seen as within the trial judge's discretion. *Pennsylvania Railroad Co. v. Hughart*, 422 Pa. 615, 222 A.2d 736 (1966); *Darlington v. Reilly*, 363 Pa. 72, 69 A.2d 84 (1949). When the decision to deny intervention is one of discretion, it is generally recognized that an intervenor is not legally bound or prejudiced by *any* judgment that might be entered in the case; rather he is free to assert his interest in some more appropriate proceeding. *Railroad Trainmen v. Baltimore & Ohio Railroad Co.*, 331 U.S. 519, 67 S.Ct. 1387, 91 L.Ed. 1646 (1947). Applying these principles, it would appear that the denial of the intervention petition in *In re Petition of City of Philadelphia* could not have a res judicata effect on the claims asserted in this case. Nonetheless, even if it could, probably due process would prevent binding sentenced inmates by the action of the intervenors, since the Court of Common Pleas never certified the class, reviewed the adequacy of representation, nor examined the need for notice to the class. *See Jeter v. Kerr*, 429 F.Supp. 435, n.3 (S.D.N.Y.1977).

transferred from Philadelphia County jails to state institutions. Plaintiffs contend that transfers without notice and hearings violate the Due Process Clause of the Fourteenth Amendment.

To address the plaintiffs' claims one must start with *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), and *Montanye v. Haymes*, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976). In these cases, the Supreme Court held that the procedural due process rights of a sentenced inmate who has been duly convicted are not infringed when he or she is transferred without a hearing, unless the state has by law or practice created an expectation that an inmate will not be transferred except for misbehavior or upon the occurrence of other specified events. Any Fourteenth Amendment "liberty" interest which exists to protect a person from the imposition by the state of more burdensome conditions, the Supreme Court found extinguished by a conviction; a valid conviction destroys a person's "liberty" interest and permits the state to confine or transfer the person to any of its prisons without a hearing even though conditions in some institutions are

harsher than others.[3] However, if the state guarantees the convicted prisoner freedom from transfer, the Fourteenth Amendment's Due Process Clause will operate to insure that the right is denied or infringed only when certain procedural protections are met.

■ The plaintiffs argue that 61 P.S. § 72 and 61 P.S. § 636 give prisoners such guarantees. The Court disagrees.[4]

The state's and county's authority to transfer inmates from county institutions to state institutions derives from 61 P.S. § 72.[5] This statute permits county officials to petition for the transfer of inmates confined in their institutions to state prisons when the county facilities are unable to furnish proper and sufficient accommodations for the care, custody and control of inmates because of overcrowded or *other existing conditions*; the Deputy Commissioner for Treatment of the Bureau of Correction is empowered to agree to such transfer and the transfer must be approved by the county court of common pleas.

The Pennsylvania transfer statute differs from the transfer statutes in *Meachum* and

3. Thus, subsequent to the *Meachum* and *Montanye* decisions, the following courts, among others, have found that the Fourteenth Amendment does not prevent the transfer of an inmate to substantially worse conditions of confinement: *Twyman v. Crisp*, 584 F.2d 352 (10th Cir. 1978); *Smith v. Saxbe*, 183 U.S.App.D.C. 210, 562 F.2d 729 (1977); *Hodges v. Klein*, 562 F.2d 276 (3d Cir. 1977); *Four Certain Unnamed Inmates v. Hall*, 550 F.2d 1291 (1st Cir. 1977); *Russell v. Oliver*, 552 F.2d 115 (4th Cir. 1977).

4. It should be noted that in *Mack v. Johnson*, 430 F.Supp. 1139 (E.D.Pa.1977), the court found that in Pennsylvania institutional transfers did not command due process' procedural protections; however, the court did not explicitly address the issues raised here.

5. 61 P.S. § 72 provides in pertinent part:
 "The Deputy Commissioner for Treatment of the Bureau of Correction in the Department of Justice is hereby authorized and empowered and, upon petition being presented to him by the board of inspectors, if there be such board, otherwise the superintendent or official in charge of any penitentiary, prison, workhouse, house of correction, or other institution for adult prisoners, located within any county, or by the county commissioners

of the county in which the institution is located, setting forth that the said penitentiary, prison, workhouse, house of correction, or other institution for adult prisoners, cannot, by reason of overcrowded condition or other existing conditions, furnish proper and sufficient accommodations for the care, custody, control and safety of the inmates thereof, and that it is requested that a certain number of inmates, set forth in such petition, should be transferred therefrom, may make an order authorizing and directing the said board of inspectors, if there be such board, otherwise the superintendent or official in charge, to transfer to another prison, penitentiary, workhouse, house of correction, or other institution for adult prisoners, such person or persons whom the board of inspectors, if there be such board, otherwise the superintendent or official in charge, shall specify and designate: Provided, however, That before any transfer is made as aforesaid the court of common pleas of the county wherein any such penitentiary, prison, workhouse, house of correction, or any other institution for adult prisoners is located, shall give its consent to such transfer . . . ."

*Montanye* which the Supreme Court found did not establish an inmate's right to expect that he or she would not be transferred. Massachusetts General Laws Ánnotated c. 127, § 97[6] and New York Correction Law § 23,[7] the relevant statutes involved in the Supreme Court cases, did not condition the correctional official's authority to transfer upon the happening of *any* specified event; rather the transfer decision was left to the sole discretion of the state commissioners of corrections. But although the Massachusetts and New York statutes grant prison officials' greater discretion than that which Pennsylvania correctional authorities maintain under 61 P.S. § 72, the Court does not find that the Pennsylvania transfer statute creates an expectation that a given inmate will not be transferred unless the state demonstrates that certain specified conditions are met.

Surely, the Pennsylvania statute *appears* to place some restrictions on the discretion exercised by state and county officials. Yet the courts have recognized that these limits are not significant and that the governmental discretion is not "restricted by an ascertainable standards or guidelines." *Cobb v. Aytch,* 539 F.2d 297 (3d Cir. 1976), *cert.*

denied, 429 U.S. 1103, 97 S.Ct. 1130, 51 L.Ed.2d 554 (1977). The "overcrowded" or "other existing condition" requirement of the statute has been interpreted broadly, practically leaving the transfer decision to the officials' unfettered judgment. *See, e. g., Commonwealth ex rel. Radziewicz v. Burke,* 169 Pa.Super. 263, 82 A.2d 252 (1951). In fact, absent a malicious or totally arbitrary transfer decision, it is nearly impossible to imagine a decision that would not fall within the broad language of the statute. The case in which transfer is unacceptable under § 72 is the exception, rather than the rule. Consequently, § 72 cannot be deemed to have provided inmates with a right or an expectation that they will not be transferred except under certain limited circumstances.

Nor does 61 P.S. § 636[8] create such rights or expectations. This section provides that inmates convicted in the city or county of Philadelphia shall be sentenced to the Philadelphia County prison if their sentence is for less than two years; the statute does not give these prisoners the right to remain there. Enacted soon after the legislature provided for the erection of the new Philadelphia County Prison,[9] the apparent pur-

**6.** At the time the transfers in the *Meachum* case occurred, Massachusetts General Laws Annotated c. 127, § 97 provided, in pertinent part:

"The commissioner may transfer any sentenced prisoner from one correctional institution of the commonwealth to another, and with the approval of the sheriff of the county from any such institution except a prisoner serving a life sentence to any jail or house of correction, or a sentenced prisoner from any jail or house of correction to any such institution except the state prison, or from any jail or house of correction to any other jail or house of correction. Prisoners so removed shall be subject to the terms of their original sentences and to the provisions of law governing parole from the correctional institutions of the commonwealth."

**7.** New York Correction Law § 23(1) provided:

"The commissioner of correction shall have the power to transfer inmates from one correctional facility to another. Whenever the transfer of inmates from one correctional facility to another shall be ordered by the commissioner of corrections, the superintendent of the facility from which the inmates are transferred shall take immediate steps to

make the transfer. The transfer shall be in accordance with rules and regulations promulgated by the department of the safe delivery of such inmates to the designated facility."

**8.** 61 P.S. § 636 provides:

"Every person who shall, after the completion of said prison, be convicted in any court of criminal jurisdiction in the city or county of Philadelphia, of any crime, the punishment of which would be imprisonment in the jail and penitentiary house of Philadelphia, for a period of time under two years, shall be sentenced by the proper court to suffer punishment in the Philadelphia county prison, by separate or solitary confinement, at hard labor, for and during the term of their sentence, and shall be fed, clothed and treated as hereinbefore provided for in this act. 1835, April 14, Pub.Law 232, § 13"

**9.** Act 1831, March 30, P.L. 228, provided for erection of county prison for Philadelphia, as follows:

Sec. 1. A prison for the city and county of Philadelphia, capable of holding at least three hundred prisoners, on the principle of the

pose of 61 P.S. § 636 was to specify which inmates were to be housed in the new institution. It was a directive to courts and prison officials and cannot reasonably be construed to have given inmates the right to demand continued incarceration in Philadelphia.

█ Furthermore, in light of 61 P.S. § 72, such a construction would not be permissible. As § 72 provides for transfers from the county institutions to the state prisons and makes no exception for Philadelphia, 61 P.S. § 636 cannot be read to do so without placing the statutes in conflict. Under the Pennsylvania Statutory Construction Act of 1972, 1 Pa.C.S.A. § 1501 et seq., two statutes that appear in conflict should, if possible, be construed to give effect to both. 1 Pa.C.S.A. § 1933. By not superimposing the construction that the plaintiffs seek to place on § 636, there is no conflict and the mandates of the Statutory Construction Act are satisfied.[10]

Plaintiffs argue that even if sentenced inmates have no state created right to a hearing under *Meachum* and *Montanye*, they were and still are entitled to a hearing prior to transfer under the reasoning of *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). In *Wolff*, the Supreme Court held that the Fourteenth Amendment Due Process Clause mandates that an inmate be afforded certain proce-

dural protections, including a hearing, before his or her good time credit is revoked because of misconduct. Plaintiffs interpret *Wolff* to mean that inmates cannot be punished, by the 1973 transfers or otherwise, without a hearing. But this reading of *Wolff* is too broad. *Wolff* required due process hearings not because a prisoner was punished, but rather because he was punished *by deprivation of state created liberty* —good time credit.

█ This case is very different for, as discussed earlier, there is no "state created liberty interest" in remaining in one institution.[11] Therefore, a transfer because of misconduct does not entitle the inmate to a hearing. *Twyman v. Crisp*, 584 F.2d 352 (10th Cir. 1978); *Four Certain Unnamed Inmates v. Hall*, 550 F.2d 1291 (1st Cir. 1977); *Curry-Bey v. Jackson*, 422 F.Supp. 926 (D.D.C.1976). In *Montanye v. Haymes, supra,* the Court held that the Due Process Clause "does not require hearings in connection with transfers whether or not they are the result of the inmate's misbehavior or may be labeled as disciplinary or punitive." *Id.*, 427 U.S. at 242, 96 S.Ct. at 2547. And the result is not changed even when the transfer exposes the inmate to more onerous conditions of confinement, so long as the conditions do not otherwise violate the constitution. *Id.; Smith v. Saxbe*, 183 U.S.App.D.C. 210, 562 F.2d 729 (1977).[12]

---

separate confinement of the prisoners, shall· be erected at such place within the city or county of Philadelphia as the commissioners hereinafter mentioned shall fix and appoint, to be called the prison of the city and county of Philadelphia; and the expense whereof shall be defrayed in the manner and out of the funds hereinafter provided."

10. Similarly, although plaintiffs contend otherwise, 18 Pa.C.S.A. § 1362 and 61 P.S. § 460.4 cannot be construed as affording inmates a right to remain in county institutions. These sections provide that inmates sentenced to a period of incarceration of less than two years may be committed to a county jail. To interpret the statutes so as to require continued confinement exclusively in county facilities would conflict with the general transfer statute and the mandate of the Statutory Construction Act. It should also be noted that 61 P.S. § 460.4 was repealed by the legislature, effective June 27, 1978. 42 Pa.C.S.A. § 20002[1392].

11. It also should be recognized that this Court found as a matter of fact that the 1973 transfers were not punishment for misconduct or meant as such. *See* Finding 19.

12. An exception to this general rule may arise when inmates upon transfer are placed in maximum security cells for substantial periods of time. The evidence established that in 1973 many sentenced inmates were placed in this type of confinement when transferred to state institutions; however, the evidence presented at trial did not show that this was a continuing practice and that sentenced inmates today were subject to the burdens of this extremely restrictive type of confinement. Therefore, even if sentenced inmates' rights were violated when they were transferred into maximum security conditions without prior hearings in 1973, the Court would not grant injunctive relief as there has been no showing of recurring violation and that such relief would be required to secure the

### C. *Constitutionality of Conditions Upon Being Transferred*

Plaintiffs claim that the 1973 transfers violated sentenced inmates' Eighth Amendment rights because the transfers subjected them to the cruel and unusual conditions existing in state institutions. The Court agrees with plaintiffs' argument so far as it extends to the State Correctional Institution at Rockview; the proof with regard to the other state institutions, although tending to establish that unconstitutional conditions existed in certain other state prisons, was insufficient to permit the Court to declare additional Eighth Amendment violations. But clearly the conditions at Rockview were intolerable. Inmates were locked in filthy cells for long periods of time with no or little time out for exercise and meals; they were not provided with hot and cold running water. Birds flew around the cells, leaving their droppings. Subjecting inmates to these conditions for a short period of time might be permissible, but incarceration under these circumstances for periods extending from a week to more than a month was inhumane. *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). The presence of birds at Rockview already has been found to be cruel and unusual punishment by Judge Muir in *Brown v. Mazurkiewicz*, No. 73–697 (M.D.Pa. February 25, 1974). These conditions offend the "dignity of man", *Trop v. Dulles*, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958), and appear "so barbarous that [they] offends society's evolving sense of decency." *Nadeau v. Helgemoe*, 561 F.2d 411, 413 (1st Cir. 1977).

What relief is required upon finding that some sentenced inmates transfer-

red to Rockview were subjected to cruel and unusual punishment in 1973 is another question. If these conditions existed today, the Court would probably enjoin transfers to Rockview. But that has not been shown to be the case. In addition, it is the present policy of the Bureau of Correction to transfer Philadelphia's sentenced inmates only to the State Correctional Institution at Graterford. Given that sentenced inmates are not likely to be transferred to Rockview and that Rockview is not presently subjecting inmates to these conditions, no basis exists for granting injunctive relief. *Holiday Inns of America, Inc. v. B & B Corp.*, 409 F.2d 614 (3d Cir. 1969); *Knuckles v. Prasse*, 302 F.Supp. 1036 (E.D.Pa.1969).

### IV. THE CLAIMS OF PRETRIAL DETAINEES

Both substantive and procedural due process objections are raised to the transfer of pretrial detainees to state correctional institutions. However, the procedural due process issue of whether hearings are required prior to the transfer of pretrial detainees need not be reached, as the Court finds plaintiffs' substantive due process argument persuasive.

To determine whether a person's due process rights have been violated, it may be necessary to engage in three separate inquiries. It is essential first to ask whether the interest allegedly infringed by the challenged government action comes within the Fourteenth Amendment's definition of "life, liberty or property,"[13] *Ingraham v. Wright*, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977); if it does not, the Due Process Clause affords no protection. If a "life, liberty or property" interest is

---

plaintiffs' rights. In light of this, the Court declines to decide in the abstract whether the Due Process Clause requires that an inmate transferred to maximum security conditions be given a hearing prior to transfer. This is a difficult question to answer especially in light of the Supreme Court's summary affirmance in *Enomoto v. Wright*, 434 U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756.

**13.** The Court rejected the sentenced inmates' due process claim because they did not estab-

lish that sentenced inmates retained a "life, liberty or property" interest under the Fourteenth Amendment or state law. The state conviction extinguished any "liberty" interest in their place of confinement that they might otherwise have had under the Fourteenth Amendment and no such "liberty" interest was substituted for or created by the state. Therefore, the Court did not reach the question of what procedures were due when inmates were transferred.

found to exist and to be threatened by the state's conduct, the next two queries will concern what process is due before the government can encroach upon the interest. As the Due Process Clause offers two types of protections—procedural and substantive—the questions asked concern whether these protections have been afforded. The "procedural" inquiry looks to the proper procedures that the individual must be accorded before the interest is infringed; proper procedures vary with the fact situation, and can involve, for instance, a hearing before an impartial tribunal. *See Wolff v. McDonnell, supra; Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). The "substantive" question is limited to whether the infringement is justified by legitimate state reasons; the necessary degree of justification depends upon the interest involved. *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Moore v. East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed. 531 (1977).

■ Turning then to the first due process inquiry, clearly pretrial detainees have greater liberty interests than sentenced inmates. Their freedoms have not been extinguished by a conviction. Pretrial incarceration infringes upon their liberty, but for one purpose only—"to secure their presence at trial." *Norris v. Frame,* 585 F.2d 1183 (3d Cir. 1978); *United States ex rel. Tyrrell v. Speaker,* 535 F.2d 823 (3d Cir. 1976). Therefore, they, unlike sentenced inmates, retain Fourteenth Amendment liberty interests which demand safeguarding.[14]

■ The transfer of a pretrial detainee incarcerated in Philadelphia County prisons to state correctional facilities encroaches upon the "liberty" the detainee retains. In the state institutions, the detainee's movement is more restricted than in Philadelphia County facilities. *See* Finding 35. His or

her freedom to participate in programs is curtailed. *See* Finding 39. Because of the increased distance between the place of incarceration and the inmate's home, the transfer's effect is to decrease the detainee's ability to visit with family and friends. *See* Finding 41. And, most importantly, an untried inmates' ability to prepare for trial and communicate with his or her attorney and the courts is severely hampered by the transfers. *See* Findings 42–45. The transfers have the same effects today as they did in 1973. *See* Findings 55–57.

Substantive due process requires adequate justification for these additional infringements upon the pretrial detainee's liberty. Various approaches have been adopted by the Courts to determine whether such justification exists. *See, e.g., Feeley v. Sampson, supra; Wolfish v. Levi,* 573 F.2d 118 (2d Cir. 1978), *cert. granted sub nom.; Bell v. Wolfish,* 439 U.S. 816, 99 S.Ct. 76, 58 L.Ed.2d 107 (1978); *Campbell v. McGruder,* 188 U.S.App.D.C. 258, 580 F.2d 521 (1978). In *Tyrrell v. Speaker, supra,* the Court of Appeals for the Third Circuit held that the state could not impose additional restrictions on the liberty of an untried inmate solely because the inmate had not yet been convicted; such restrictions were found not to serve the "only legitimate interest" the state had in detention of the accused, *i.e.,* guaranteeing the inmate's presence at trial. A year later this standard was modified somewhat or, perhaps, just elaborated upon in *Main Road v. Aytch,* 565 F.2d 54 (3d Cir. 1977), and just recently the Court of Appeals instructed that restrictions on a detainee's liberty "are defensible only when they can be justified by the requirements of prison administration, or are inherent in the nature of confinement." *Norris v. Frame, supra* at 1187. The Court recognized that inherent in the nature of

14. In *Feeley v. Sampson,* 570 F.2d 364 (1st Cir. 1978) the court found that *Meachum* and *Montanye* controlled and prevented due process challenges to transfers of pretrial detainees. *See also, Epps v. Levine,* 457 F.Supp. 561 (D.Md.1978). This Court disagrees, finding the Supreme Court cases distinguishable. In *Meachum* and *Montanye,* the Supreme Court found that the Fourteenth Amendment Due Process Clause offered the transferred inmates no protection because they had been convicted and the conviction extinguished their liberty interest. In this case, the pretrial detainee remains unconvicted and, therefore, not deprived of his other freedom beyond that which is necessary to secure presence at trial.

confinement is protection of the security of the prison. In this regard, the Court stated:

> "If the fact of confinement itself justifies challenged restrictions, the Court will not 'second-guess' administrators regarding the best means to protect their legitimate security interests. But in order for the prison to defend the means it has chosen, it must demonstrate that they are means aimed at the proper end: the security interests of the prison." *Id.* at 1188.

In this case, defendants claim that the 1973 transfers were required because of "security". The Court agrees that in 1973, when Philadelphia County prison officials transferred detainees, they believed the transfers were necessary to relieve overcrowding and defuse the tensions created by the Holmesburg murders. Although the latter was a legitimate security consideration the officials did not determine or even, in fact, consider whether it was necessary to transfer *detainees* to secure the jails. Aytch ordered the compilation of a "troublemakers" list and did not ask for pretrial detainees to be distinguished. And in finalizing the transfer list to submit to the Court of Common Pleas, the officials did not consider what steps could be taken to isolate pretrial detainee troublemakers within Philadelphia. It was never determined that the transfer of pretrial detainees was necessary.

As the purpose of the 1973 transfers of detainees was to insure the prisons' security, it can be seriously argued that under *Norris v. Frame, supra,* the Court should not question the legitimacy of employing these means, even though they were not necessary to guarantee institutional security. And, if the denial of liberty that detainees suffered was confined to losses of programs and visits with family and friends, the Court might be very reluctant, in light of *Norris,* to further scrutinize defendants' actions. But this case involves an important freedom, which was jeopardized by the transfers. Because of the transfers, many inmates were unable to prepare effectively for trial and communicate with their attorneys and the courts. Therefore, this Court believes that defendants must demonstrate that the transfers were necessary to insure the security of the jails.

In the *Norris* decision, the Court of Appeals stated that it would not second-guess the prison officials' decision that security considerations justify infringements on a detainee's liberty. But the Court in that case, where a detainee's right to continue using methadone was in question, was not addressing the protections that must be afforded liberty interests which generally are given greater judicial safeguarding, such as the freedom to prepare for trial and communicate with court and counsel. *See Wolfish v. Levi, supra.* Therefore, it is this Court's opinion that the Court of Appeals, as have other courts, would require defendants to demonstrate that the means which they choose to insure security and that cause encroachment upon these important liberty interests of detainees are necessary to attaining the end that they seek.

In *Campbell v. McGruder, supra,* the Court of Appeals for the District of Columbia formulated a test for determining whether substantive due process is offended when a detainee's ability to prepare for trial is infringed by a prison restriction or condition.

> "[C]onditions of confinement that impede a defendant's preparation of his defense (apart, of course, from the fact of confinement itself) or that are so harsh or intolerable as to induce him to plead guilty, or that damage his appearance or mental alertness at trial, are constitutionally suspect and can be justified only by the most compelling necessity." *Id.,* 188 U.S.App.D.C. at 269, 580 F.2d at 532.

In this case, defendants have not only failed to meet that standard, but they have not shown that the transfers of detainees were necessary at all to secure the prisons.

A judicial determination of what the prison's needs were in 1973 and whether the prison sufficiently considered the effects of the transfers on those who were untried may appear to be undue interference with

prison officials' authority and duties. Although the courts are not to become involved in prison administration and to judge the necessity of every restriction placed upon detainees the rendering of the determinations made here and the exercise of judicial hindsight is essential if these important rights of pretrial detainees are to be protected.

To determine what relief is appropriate, the present circumstances and the likelihood that future transfers will violate pretrial detainees' rights must be considered. The Court has found that if detainees are transferred from Philadelphia to state institutions today they will be subjected to the same or similar losses of liberty that detainees experienced in 1973, including impairment of their ability to prepare for trial. In addition, the state has not shown that detainees would be transferred only when security interests compel the transfers. In fact, given the language of 61 P.S. § 72 and its broad interpretation by the Courts, *see* discussion *supra* at p. 923, there is no assurance that the transfers which infringe other liberties besides the detainee's freedom to prepare for trial would meet the standards enunciated in *Norris v. Frame,* that is that they would be required for prison administration or be inherent in confinement.

■ Therefore, it appears to the Court that in most instances a transfer would violate the pretrial detainee's due process rights and subject him or her to serious harm, such as not being able to prepare a criminal defense. Under these circumstances, where an adequate remedy at law would be lacking, it seems appropriate to enjoin future transfers without consent of pretrial detainees, unless and until defendants can present a change in circumstances that would justify subjecting untried inmates to the burdens described above. *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).

Defendants have argued that injunctive relief would be inappropriate since there is no threat that detainees will be transferred without their consent. Nonetheless the Court does not find this to be the case. Under 61 P.S. § 72, defendants have the authority to seek the transfer of untried inmates. Although, as of trial, it was the Commonwealth's policy not to accept detainees, that policy has not been embodied in any regulations of the Bureau of Correction. Further, the Superintendent of the Philadelphia County Prisons has not expressed an intention to abandon his efforts to seek detainee transfers. He opposed the entry of the consent decree previously filed in this case, in part because it prohibited the transfer of detainees; surely, such action indicates a desire to continue the practice. And the Philadelphia prison officials failure to attempt transfer of detainees since 1973 does not necessarily mean that they do not wish to do so; their inaction can also be interpreted as an avoidance of further litigation pending the outcome of this suit. The threat, then, that defendants will transfer pretrial detainees under 61 P.S. § 72 continues and unless injunctive relief is given now, defendants could quickly execute transfers, irreparably injuring detainees' rights, without affording them the opportunity to seek prior judicial relief.

## V. THE CLAIMS OF UNSENTENCED INMATES

Inmates who have been convicted of a crime but remain unsentenced also seek to invoke the Due Process Clause for protection. They claim that substantive due process prohibits any transfers, and that, if there are transfers, procedural due process requires prior notice and a hearing.

But to determine whether such safeguards are due, the unsentenced inmate's liberty interest in remaining in Philadelphia prisons must be examined. Although there is no assurance that the unsentenced inmate will be subjected to a term of incarceration by the sentencing judge, the conviction alone appears to extinguish any "liberty" interest formally derived from the Fourteenth Amendment. In *Meachum v. Fano, supra,* a case involving a sentenced inmate's transfer, the Supreme Court found that

"The Due Process Clause by its own force forbids the State from convicting any person of crime and depriving him of his liberty without complying fully with the requirements of the Clause. But given a valid *conviction*, the criminal defendant has been constitutionally deprived of his *liberty* to the extent that the state may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution. . . . The conviction has sufficiently extinguished the defendant's liberty interest to empower the State to confine him in *any* of its prisons.

Neither, in our view, does the Due Process Clause in and of itself protect a duly convicted prisoner against transfer from one institution to another within the state prison system." (emphasis added) *Id.*, 427 U.S. at 224, 96 S.Ct. at 2538.

Therefore, upon being convicted the unsentenced inmate, for purposes of Fourteenth Amendment "liberty", assumes the same status as the sentenced prisoner. *See United States ex rel. Roberson v. Roth*, 448 F.Supp. 1359 (E.D.Pa.1978).

The next question, then, is whether the state has differentiated between sentenced and unsentenced prisoners and created a liberty interest affecting transfers of

the latter which would command due process protection. This Court believes not.

Under Rule 4010 A of the Pennsylvania Rules of Criminal Procedure,[15] a criminal defendant convicted of a crime not punishable by death or life imprisonment enjoys the same right to bail as a pretrial detainee, unless certain other enumerated conditions exist. Even though this rule entitles a convicted prisoner, in certain instances, to be treated like a detainee for bail purposes, it does not guarantee that inmate the right to expect that he or she otherwise will be accorded the same privileges or rights as detainees; no reasonable interpretation of this Rule would allow the Court to find that by this provision the state has provided unsentenced inmates with the same transfer rights as detainees.

Nor do other Pennsylvania laws upon which plaintiffs rely afford unsentenced inmates the protection sought. First, plaintiffs cite the Court to 61 P.S. § 72. For the reasons stated, *supra*, in the discussion of sentenced inmates' rights, this statute cannot be found to have provided unsentenced inmates with a right to remain in Philadelphia County facilities and not to be transferred to state institutions.

The second basis for asserting a state created liberty interest in remaining in Philadelphia facilities is 61 P.S. § 621.[16] As

**15.** Rule 4010 A provides:

A. After the Verdict and Before Sentencing
(1) Capital and Life Imprisonment Cases. The defendant shall not be released on bail upon a finding of guilty of an offense which is punishable by death or life imprisonment. However, if post-verdict motions are not disposed of within a reasonable period of time thereafter, the judge may in his discretion allow bail.
(2) Other Cases. The defendant shall have the same right to bail after verdict and before the imposition of sentence as he had before trial when the aggregate of possible sentences to imprisonment on all outstanding verdicts against him within the same judicial district cannot exceed three years. Except as provided in Section A(1), when the aggregate of such possible sentences can exceed three years, the right to bail shall continue unless the judge makes a finding:
(i) that an appeal would be frivolous, or

(ii) that no one or more conditions of bail will reasonably assure the future appearance of the defendant, or
(iii) that the defendant poses a danger to any other person or to the community or to himself.
In the event of such finding, the judge may revoke or refuse to set bail.

**16.** 61 P.S. § 621 provides:
"So soon as the said new county prison and debtors' apartment shall be erected and prepared for the reception of prisoners, it shall be the duty of the inspectors of the prison of the city and county of Philadelphia to take charge of the same, and to remove or cause to be removed thereto, all persons who may then be confined in the prison on Arch Street, in the said city, and the officers who have them in charge, the debtors and persons confined as witnesses to be removed to the debtors' apartment, and the others to the new prison of the city and county aforesaid; and such provision shall be made in the arrange-

was the case with 61 P.S. § 636, discussed *supra*, this section when enacted was meant as a housing direction for the new Philadelphia County Prison. *See* note 9 *supra*. It instructed that all persons who formerly would have been housed in the old Arch Street Prison were to be confined in the new Philadelphia county prison. Construing this statute to guarantee inmates freedom from transfer disregards the provision's historical setting. The statute was enacted to instruct officials as to who to confine in the newly erected institution and, in light of 61 P.S. § 72 it would be unreasonable to interpret the statute otherwise.

The third statute upon which plaintiffs' position is premised is 61 P.S. § 781,[17] which provides that in every city of the first class a house of detention shall be established for the detention of all persons charged with a crime. It does not create an expectation or guarantee that unsentenced inmates will not be transferred from Philadelphia. First, the statute's applicability to unsentenced persons is questionable, as they have not only been charged with a crime, but have been convicted of one. Moreover, again, it would be unreasonable to read the statute as more than a housing direction to local officials, that is, to create a house of detention and house certain persons there; it does not guarantee persons charged with a crime the right to stay in these houses of detention.

The plaintiffs have not shown that any other state law, regulation or rule insures unsentenced inmates freedom from transfer. And the other points they have raised with respect to unsentenced inmates have

been addressed by the Court in its discussion of sentenced inmates' rights. Therefore, the Court finds no basis for granting unsentenced inmates relief.

CONCLUSIONS OF LAW

1. The Court's jurisdiction over this action is based upon 28 U.S.C. §§ 1343(3) and 1343(4).

2. Although the named plaintiffs' claims are moot, the claims of the class are not.

3. Nor is the action rendered moot by changes in defendants' transfer policies, as defendants remain free to alter their policies and repeat the allegedly wrongful conduct at any time.

4. Plaintiffs have failed to establish that the 1973 transfers of Orthodox and Black Muslims were acts of religious discrimination in violation of the First and Fourteenth Amendments.

5. The 1972 decision of the Court of Common Pleas in *In re Petition of City of Philadelphia*, April Term, 1972, No. 2634, does not preclude sentenced inmates' challenge to the legality of the 1973 transfers.

6. Fourteenth Amendment Due Process does not require that a hearing be afforded sentenced inmates transferred to state institutions from Philadelphia County prisons in 1973 or today.

7. The conditions of confinement that inmates transferred from Philadelphia County prisons to Rockview Correctional Institutional Institution in 1973 experienced constituted cruel and unusual punishment in violation of the Eighth Amendment.

ment of said debtors' apartment as that persons confined as witnesses shall have no communication with debtors, and thenceforth all persons who, by the existing laws of this commonwealth, are liable to be confined in the Arch Street prison, as also all persons who may be confined for debts, or as witnesses, shall be respectively sent to the new prison of the city and county of Philadelphia, in the debtors' apartment, there to be kept, treated and governed, according to such rules and regulations as the said inspectors, who have the charge thereof, with the approbation of the court of common pleas and quarter sessions of said county, and the mayor's

court of said city, may, from time to time, ordain and establish: Provided always, That the same be not inconsistent with, or contrary to, the constitution and laws of this commonwealth, and the provisions of this act."

17. 61 P.S. § 781 provides:
"In every city of the first class there may be established, in the manner hereinafter prescribed, a house or houses of detention for the reception and detention of all persons charged with crime, or held as witnesses in any judicial proceeding."

Nonetheless, injunctive relief will not be granted, as Rockview is not presently subjecting inmates to these conditions, and it is very unlikely that members of plaintiff class will be transferred to Rockview in the future.

8. The 1973 transfers of pretrial detainees to state institutions violated the detainees substantive due process rights. As the Court finds it is likely that future transfers of detainees would result in similar constitutional deprivation, it will enjoin future transfers of pretrial detainees that are without the inmate's consent, until such time as the state and local authorities demonstrate that the transfers will not violate the detainees' rights.

9. The due process rights of unsentenced inmates were not offended by the 1973 transfers and the Due Process Clause offers unsentenced inmates in Philadelphia County prisons no protection from transfers pursuant to 61 P.S. § 72.

10. Judgment will be entered in accordance with the conclusions herein.