643 F.2d 946
 Charles COBB, James S. Glover, Darrel X. (Jackson), Michael
Jordan, Gregory Martinez, Jeffrey X. Robinson
v.
Louis S. AYTCH, F. Emmett Fitzpatrick, Joseph O'Neill, Allyn
Seilaff, Israel Packel, Joseph Vines on behalf of
himself and as representative of the
class of plaintiffs, Appellant.
Charles COBB, James S. Glover, Darrel X. (Jackson), Michael
Jordan, Gregory Martinez, Jeffrey X. Robinson
v.
Louis S. AYTCH, F. Emmett Fitzpatrick, Joseph O'Neill, Allyn
Seilaff, Israel Packel, Louis S. Aytch,
Superintendent of the Philadelphia
Prisons, and his successors in
office, Appellant.
 Nos. 79-1459, 79-1460.
 United States Court of Appeals, Third Circuit.
 Argued Nov. 14, 1979.
Reargued Nov. 17, 1980.
Decided March 4, 1981.
As Amended March 13, 1981.
 
 Elliott B. Platt (argued), Community Legal Services, Inc., Law Center Northeast, Philadelphia, Pa., for plaintiffs-appellants.
 Mark N. Cohen (argued), Asst. Atty. Gen., Michael Von Moschzisker, Deputy Atty. Gen., Edward G. Biester, Jr., Atty. Gen., Philadelphia, Pa., for Commonwealth defendants.
 John M. Myers, Philadelphia, Pa. (argued), Joseph P. Ryan, Asst. City Sol., James M. Penny, Jr., Deputy City Sol., Sheldon L. Albert, City Sol., for Municipal defendants.
 Douglas Riblet, Asst. Public Defender, Benjamin Lerner, Chief Defender, Philadelphia, Pa., for defender Ass'n of Philadelphia as amicus curiae.
 Before GIBBONS, HIGGINBOTHAM and SLOVITER, Circuit Judges.
 Before SEITZ, Chief Judge, and ALDISERT, ADAMS, GIBBONS, ROSENN, HUNTER, WEIS, GARTH, HIGGINBOTHAM and SLOVITER, Circuit Judges.
 OPINION OF THE COURT
 GIBBONS, Circuit Judge.
 
 
 1
 These cross appeals bring before us a final judgment disposing of a Complaint which was filed on June 11, 1973. The case is a class action challenging transfers of inmates from three correctional institutions in Philadelphia, maintained by Philadelphia County, to correctional institutions maintained by the Commonwealth of Pennsylvania at locations distant from Philadelphia. Inmates subjected to such transfers included pretrial detainees who were unable to make bail, inmates who had been tried and convicted, but who had not been sentenced, and sentenced inmates. The final judgment grants injunctive relief in favor of pretrial detainees but denies relief sought on behalf of the convicted but unsentenced inmates and the sentenced inmates. The class action plaintiffs and the defendants responsible for the operation of the Philadelphia correctional facilities (the Philadelphia defendants) both appeal. The defendants responsible for the operation of the Commonwealth correctional facilities (the Commonwealth defendants) have not appealed, but filed a brief supporting the appeal of the Philadelphia defendants. We affirm in part, vacate in part and reverse in part.
 
 I.
 
 2
 Philadelphia County operates three correctional facilities: Holmesburg Prison; the House of Correction; and the Philadelphia Detention Center. All three facilities are within the city limits and house inmates in each of the three classes referred to above. In the spring of 1973 the design capacity of the three facilities totaled 1,950 persons, but for various reasons they actually held a substantially larger total population. Although the facilities were overcrowded, most inmates could move freely about their cell blocks, shower at any time, watch television until 11:00 p. m., eat in the dining hall, watch movies in an auditorium or on the cell block, and occasionally attend shows presented by outside entertainers. A variety of educational and organizational programs were also available to them. There was, moreover, organized religious activity. Among the groups engaging in that activity was the Orthodox Muslims, whose leader at Holmesburg Prison was inmate Lee Jenkins. In May of 1973 inmate Joseph Bowen was attempting to displace Jenkins as leader of the Orthodox Muslims in Holmesburg and prison administrators in charge of that facility received reports that Bowen and his followers had resorted to violence and threats to achieve that end. Moreover, Bowen sought leave from the prison administration to use a storage room on "I" Block as a private Muslim prayer room. Deputy Warden Fromhold refused the request, believing that such a room would create a security risk. On May 31, 1973, Bowen and another Orthodox Muslim, Frederick Burton, requested to see Deputy Warden Fromhold about the prayer room. Shortly after they were admitted to a room occupied by Warden Curran and Deputy Warden Fromhold, Guard Captain Taylor heard calls for help and entered to find the two inmates stabbing the Warden and Deputy Warden. They died of the stab wounds and Captain Taylor was seriously wounded. Bowen and Burton were charged with the killings.
 
 
 3
 Shortly after the stabbings the Deputy Superintendent of the Philadelphia County Prisons, Edmund Lyons, arrived at Holmesburg and assumed control. He was informed by correctional officers of the recent power struggle among the Orthodox Muslims, of the fact that many Muslims were housed in "I" Block, of the possibility of revenge from some members of that sect over the trouble Bowen and Burton had caused, and of the possibility that some followers of Bowen and Burton might instigate trouble to show support for them. Lyons recommended to Louis S. Aytch, the Superintendent of Philadelphia County Prisons, that the ten or twelve inmates on "I" Block who were allied with Burton and Bowen be transferred to the Detention Center to assure their safety and the security of the Holmesburg facility. On May 31, 1973, Superintendent Aytch ordered twelve Orthodox Muslims on "I" Block whom he thought were associated with Burton and Bowen transferred to the Detention Center. Within 48 hours of their arrival at the Detention Center, the twelve were transferred to Commonwealth correctional facilities outside Philadelphia. These transfers were made without the approval of the Pennsylvania Court of Common Pleas, although Pennsylvania law required such approval. See Pa.Stat.Ann. tit. 61, § 72 (Purdon 1979).
 
 
 4
 On May 31, 1973, Superintendent Aytch instructed the Acting Chief Registrar of the Philadelphia County prisons to compile a list of unsentenced prisoners whose names could be sent to the Court of Common Pleas as persons proposed for transfer to Commonwealth correctional facilities. A list of 110 unsentenced prisoners was prepared. On June 1, 1973, Mr. Aytch instructed several members of his staff to prepare lists of inmates who were disruptive of the normal operation of the Philadelphia facilities. When asked whether the lists should include Muslims in those institutions, Aytch responded affirmatively. In preparing the lists the officers responsible were instructed not to distinguish among untried, unsentenced, and sentenced inmates. A final transfer list of 287 inmates was prepared, which included 150 pretrial detainees, 101 convicted but unsentenced inmates, 25 sentenced inmates, 5 persons held for the Pennsylvania Parole Board, 4 persons held for the United States Marshal, 1 held for another jurisdiction, and 1 serving back time. Of the 287 inmates on the transfer list, 28 were being held in the House of Correction, 173 in Holmesburg, and 86 in the Detention Center. Only 24 of the 287 had any record of misconduct as an inmate resulting in disciplinary action. At the time when the list was completed the Philadelphia County prisons housed 445 sentenced inmates and 2,167 persons who were awaiting trial.
 
 
 5
 On or about June 6, 1973, Mr. Aytch filed with the Court of Common Pleas of Philadelphia County a Petition for Transfer to Commonwealth facilities of the 287 inmates whose names were on the list. On June 7, 1973, acting pursuant to Pa.Stat.Ann. tit. 61, § 72, the President Judge of the Philadelphia Court of Common Pleas, after deleting 50 names of inmates with pending court dates, approved the Petition. Of the 232 inmates whose names remained, there were 115 pretrial detainees, 82 convicted but unsentenced inmates, 25 serving sentences, 4 being held for the Pennsylvania Parole Board, 4 being held for the United States Marshal, 1 being held for another jurisdiction, and 1 serving back time. The Court of Common Pleas acted ex parte, affording the affected inmates neither notice nor opportunity to be heard.
 
 II.
 
 6
 On June 11, 1973 the Complaint that commenced this prolonged lawsuit was filed. It alleged that various violations of the inmates' constitutional rights had occurred or would occur as a result of the proposed transfers and sought preliminary and permanent injunctive relief against those transfers. The district court issued an order to show cause containing a temporary restraining order preventing transfers outside Philadelphia County. On June 14, 1973, the district court denied plaintiffs' motion for a preliminary injunction and they filed a notice of appeal. This court granted the plaintiffs' motion for an expedited briefing schedule. Before the appeal was heard, however, the parties filed a stipulation of dismissal under Rule 42(b) of the Federal Rules of Appellate Procedure.
 
 
 7
 Since no preliminary injunction had been granted, in late June of 1973, 123 inmates were transferred to Commonwealth correctional facilities pursuant to Aytch's Petition and the Order of the Court of Common Pleas. Later in the same month two more inmates were transferred. These transfers were also accomplished without any notice to the inmates involved, to their attorneys, or to their families. Their attorneys were notified only after the transfers had occurred. The transferees were placed in five different state correctional institutions:
 
 
 8
 Huntingdon, 220 miles from Philadelphia;
 
 
 9
 Dallas, 120 miles from Philadelphia;
 
 
 10
 Pittsburgh, 300 miles from Philadelphia;
 
 
 11
 Rockview, 201 miles from Philadelphia;
 
 
 12
 Camp Hill, 90 miles from Philadelphia.
 
 
 13
 In October 1973, two additional inmates on the list approved by the Court of Common Pleas, who had testified in actions against city officials after June 1973, were transferred. Throughout 1973 Mr. Aytch continued to transfer both unsentenced and sentenced inmates, although in smaller numbers.
 
 
 14
 Following the withdrawal of the first appeal the case proceeded in the district court, and on July 3, 1975 the Commonwealth defendants agreed to a consent decree which permanently enjoined them from receiving any Philadelphia County prisoners for transfer to state correctional institutions, except unsentenced transferees who voluntarily consented to such transfer, or prisoners serving sentences who had first been afforded a due process hearing to establish an administrative or punitive reason for transfer. That consent decree did not formally bind the Philadelphia defendants, but they nevertheless objected to its entry and took an appeal. In July, 1976, this court held that Aytch, who was one of these defendants, had standing to appeal from the entry of the decree because it had an effect upon the exercise of the discretion vested in him by Pa.Stat.Ann. tit. 61, § 72 to request approval from the Court of Common Pleas for transfers from the institutions he administers to those administered by the Commonwealth. We reversed the district court's affirmance of the consent decree, holding that because Aytch's exercise of discretion was affected, it was error to approve its entry over his objection without a hearing. However, we expressed no opinion as to the merits of the requested relief, and remanded for trial. Cobb v. Aytch, 539 F.2d 297, 301 (3d Cir. 1976), cert. denied, 429 U.S. 1103, 97 S.Ct. 1130, 51 L.Ed.2d 554 (1977).
 
 
 15
 After our remand, on January 24, 1977, Harry E. Wilson, Director of Special Services for the Pennsylvania Bureau of Corrections, issued a memorandum describing the procedure which must be followed by a warden seeking to transfer a county inmate. According to the memorandum the warden must complete a Petition for Transfer form, including a short narrative indicating the reasons for the sought transfer and any special conditions of which the state facility should be aware. The transferring institution must afford a hearing prior to transfer for all untried and unsentenced inmates whom the county seeks to transfer. After the hearing the Pennsylvania Bureau of Corrections must approve the transfer. Only after these steps have been completed is the Petition for Transfer submitted to the Court of Common Pleas for approval. This memorandum, while it states the policy of the Commonwealth defendants as of January 1977, is neither a statute nor a regulation having the force of law, and the policy it states may be changed at any time. As late as May 1977, however, the Philadelphia defendants submitted a Petition for Transfer of 150 sentenced inmates of whom 54 were accepted for transfer by the Commonwealth defendants. Presumably these transfers were in compliance with the January 24, 1977 memorandum.
 
 III.
 
 16
 In July 1977, over four years after the Complaint was filed, the case was reached for trial, and on January 30, 1979, the district court filed its findings of fact and conclusions of law. Cobb v. Aytch, 472 F.Supp. 908 (E.D.Pa.1979). The court's findings, although not organized in this fashion, may be divided into:
 
 
 17
 1) those bearing upon the motivation for transfers of those selected;
 
 
 18
 2) those bearing upon the access to legal representation and to timely trial of untried inmates and sentencing of unsentenced inmates; and
 
 
 19
 3) those bearing upon changes in the conditions of confinement resulting from the transfers.
 
 
 20
 As to the motivation for the May 31, 1973 transfer of twelve Orthodox Muslims, the court found that Lyons believed that the transfers would serve Holmesburg's interest in security and the inmates' interest in safety, and that he selected the twelve not based on their religion, but on their association with Bowen and Burton. Aytch's action was also found to be based on the twelve inmates' association with Bowen and Burton, and not on their religious beliefs.
 
 
 21
 Bearing on the motivation for transferring the remaining inmates are the court's findings: that prior to the May 31, 1973 homicides there had been discussions among representatives of the Philadelphia Criminal Justice System, the Court of Common Pleas, the Philadelphia District Attorney's Office and Superintendent Aytch about means for alleviating overcrowding in the Philadelphia prison system; that after the homicides Aytch decided to reduce the number of inmates as a means of defusing what he believed to be an explosive situation; that when Aytch responded affirmatively to an inquiry as to whether Muslims should be included on the list for transfer, he did not mean, and was not understood to mean, that all Muslims should be transferred, but rather that only those Muslims who were also disruptive, including those already isolated from the general prison population, should be included; that the officer in charge of compiling the list of troublemakers understood that it should include not only those against whom charges of disciplinary infractions could be brought, but also those against whom the corrections officers could not obtain sufficient evidence to file formal charges, although that in ordering the preparation of a list of inmates who were thought by the staff to be disruptive of the normal operation of the institutions Aytch did not mean to punish these individuals. Id. at 913-15.
 
 
 22
 The trial court also made extensive findings on access to legal representation and timely trial. The Defender Association of Philadelphia represents 80% of the incarcerated defendants in Philadelphia County prisons. Prior to trial the assistant defender representing a defendant goes to the prison and interviews him respecting the facts of the case, possible witnesses, his background and psychiatric services. The court found that interviews are essential to the defense because they allow the attorney to develop the necessary attorney-client relationship and to prepare the case. It is often necessary for these attorneys to interview clients at the post-trial stage in order to prepare for sentencing. The Defender Association of Philadelphia lacked in 1973, and it lacks today, the resources of money and time to conduct either type of attorney-client interview at the Commonwealth institutions distant from Philadelphia to which transfers were made. Most of the untried inmates who were transferred in 1973 and represented by the Defender Association were deprived of these pretrial interviews. On several occasions, transferees missed court appearances and parole hearings when they were not returned to Philadelphia on time. During one eight to ten week period, for example, 25% of the transferees' cases had to be continued because the defendants were not brought to court. Due to continuances and the prolongation of the pretrial period some transferred inmates spent more time in pretrial incarceration than the eventual length of their sentences. During the same time period, inmates detained in Philadelphia County prisons missed Philadelphia court appearances in only 3 to 4 percent of their cases.
 
 
 23
 The trial court also made extensive findings about the changed conditions to which transferees were subjected. We noted in Part I, supra, the relative freedom of movement and the various benefits available in the Philadelphia prison system. The district court found:
 
 
 24
 35. At the state institutions, the transferees lost the freedom of movement that they had in Philadelphia County facilities. They were placed in several types of more restrictive confinement. Some inmates were housed in maximum security, often not permitted out of their cells at all; they stayed in maximum security for periods ranging from three to four days to the entire time at the state prison. Other inmates were placed in quarantine, for all or part of their stays in the state facility, where they would be allowed to leave their cells for meals and two hours of recreation per day on the cell block. And another group was placed on a cell block where they were permitted out of their cells for most of the day and given yard and recreational privileges.
 
 
 25
 36. In making housing assignments, state officials did not distinguish between inmates on the basis of trial status; inmates held for trial, unsentenced inmates and sentenced prisoners were all placed in the housing conditions as described in Finding 35.
 
 
 26
 37. A transferee's release from maximum security or quarantine confinement was often conditioned upon his accepting an institutional job. This condition was applied equally to untried, unsentenced and sentenced inmates.
 
 
 27
 38. Some of the housing facilities at the State Correctional Institution at Rockview were filthy and birds flew around some of the cell blocks in which the transferees were housed. Often hot and cold water was unavailable and only one shower a week was permitted. Transferees may have experienced these conditions for a substantial period of time, i. e. from one week to several months.
 
 
 28
 39. Generally, institutional programs were unavailable to transferees and in several instances the transfer caused inmates to forego educational programs that they participated in while incarcerated in Philadelphia.
 
 
 29
 40. The mail privileges of at least some of the transferees were restricted in state institutions. At some prisons, transferees could not write to inmates in county prisons and incoming mail was read by prison officials. One inmate's letter was returned to him before it was mailed.
 
 
 30
 41. Although many transferees received weekly visits from family and friends while incarcerated in Philadelphia, such visits generally terminated when they were transferred to state facilities. Presumably, the drastic reduction in visits was occasioned by the increase in distance between the homes of the visitors and the state facilities.
 
 
 31
 42. For various reasons, on several occasions, transferees missed court appearances and parole hearings when they were not returned to Philadelphia on time. In fact, during one eight to ten week period, 25% of the transferees' cases had to be continued because defendants were not brought to court. Due to continuances and the prolongation of the pretrial period, some inmates spent more time in pretrial incarceration than the eventual length of their sentence.
 
 
 32
 43. During the same period of time, inmates incarcerated in Philadelphia County prisons missed Philadelphia County court appearances in only 3 to 4 percent of their cases.
 
 
 33
 53. As of April 7, 1977, the policy of the Bureau of Corrections was to afford an untried or unsentenced inmate a housing hearing upon his arrival at the state institution. The hearing was to be held on at least 24 hours notice to the inmate.
 
 
 34
 54. The policy of the Pennsylvania Bureau of Corrections, as of trial, was to place sentenced transferees in the state institution closest to the county from which they were transferred. Consequently, Philadelphia sentenced inmates transferred to state institutions should be assigned to the State Correctional Institution at Graterford. There the sentenced transferee would be treated as any other state prisoner in Graterford.
 
 
 35
 55. The present restrictions placed on an untried or unsentenced transferee's freedom in the state institution vary depending upon the institution and the security risks posed by the particular inmate. However, generally, inmates are confined to their cells for most of the day, and are usually allowed to go out for meals and exercise. It is the policy of the Bureau of Correction that untried and unsentenced transferees are not forced or permitted to work. Institutional programs are not available to these inmates.
 
 
 36
 The trial court found that at the time of trial conditions of confinement in the Philadelphia prisons remained as described in Part I, supra, and concluded that inmates face more restrictive confinement when transferred to state facilities than they experience in Philadelphia.
 
 
 37
 Summarizing, the court found that the transfers had neither a religious nor a punitive motivation, that they had the effect of significantly interfering with access to counsel and with prompt disposition of the transferees' case, and that they resulted in significantly more severe conditions of confinement, at places distant from prisoners' homes. With those findings in mind we turn separately to the legal positions of the three subclasses of inmates involved.IV.
 
 
 38
 In the six years between filing of the Complaint and the argument of this appeal, the Supreme Court anticipated and rejected most of the arguments which sentenced prisoners might have advanced against being transferred from the Philadelphia to the Commonwealth prison systems.
 
 
 39
 The trial court expressly found that the transfers were not made for the purpose of inflicting punishment. The evidence respecting the atmosphere in Holmesburg following the murder of Warden Curran and Deputy Warden Fromhold arguably points to a different conclusion, but we cannot say that the finding as to absence of a punitive purpose is clearly erroneous. Since, then, we are not dealing with disciplinary transfers, whatever minimum due process standards with respect to prison disciplinary proceedings survive, Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), and Baxter v. Palmigiano, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), are not here involved.[1] In addition, the trial court's fact findings exclude religion as a factor in the selection of inmates for transfer. Although the initial twelve selected were Orthodox Muslims, and the May 31, 1973 homicides which prompted the transfers grew out of a dispute over a separate Muslim place of worship, the court's conclusion that the twelve were selected because of their association with Burton and Bowen and the consequent fear of further violence is not clearly erroneous. The same is true of the finding that the instruction to include Muslims in the subsequent transfer list was intended and understood as an instruction to apply to them the same criteria as were applied to other inmates. Given these findings, the narrow first amendment protections still applicable to sentenced prisoners after Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 129-33, 97 S.Ct. 2532, 2539-41, 53 L.Ed.2d 629 (1977), are not here involved. Cf. St. Claire v. Cuyler, 643 F.2d 103 (3d Cir. 1980) (Adams, J., dissenting from denial of petition for rehearing).
 
 
 40
 The sentenced inmates must look instead to constitutional protections bearing upon the place or conditions of their confinement. Here they face the formidable barriers imposed in Meachum v. Fano, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), and Montanye v. Haymes, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976). Those cases hold that inmates sentenced by the state have no liberty interest protected by federal law, and that they are entitled to due process protection only of such expectations with respect to place or conditions of confinement as are created by state law. Since Meachum and Montanye the Court has held that once a state grants to an individual a protected liberty interest, that individual may not be deprived of that interest without procedural safeguards appropriate under the Constitution. Vitek v. Jones, 445 U.S. 480, 488-90, 490 n.6, 100 S.Ct. 1254, 1261-62, n.6 (1980).
 
 
 41
 The plaintiff class representatives urged upon the district court the contention that Pennsylvania by statute, Pa.Stat.Ann. tit. 61, §§ 72, 636, grants sentenced inmates such expectations. The trial court rejected that interpretation of Pennsylvania law. Section 636 which was originally enacted in 1835, Act of April 14, 1835, P.L. 232, § 13, a few years after the passage of the statute authorizing the construction of a separate Philadelphia prison,[2] presently provides:
 
 
 42
 Every person who shall, after completion of said (Philadelphia) prison, be convicted in any court of criminal jurisdiction in the City or County of Philadelphia, of any crime, the punishment of which would be imprisonment in the jail and penitentiary house of Philadelphia, for a period of time under two years, shall be sentenced by the proper court to suffer punishment in the Philadelphia County prison ... for and during the term of their sentence ....
 
 
 43
 Pa.Stat.Ann. tit. 61, § 636. The plaintiffs urge that this statute gives Philadelphia inmates serving sentences of less than two years a state law expectation that they will serve their sentence in Philadelphia rather than at some place remote from their families. The district court, however, read section 636 as a mere precatory directive to courts and prison officials, which could not reasonably be construed to confer any rights on inmates.
 
 
 44
 If section 636 stood alone we would find the district court's construction unpersuasive in the absence of Pennsylvania case law so construing it, for the plain language seems mandatory. Moreover, section 636 must be considered in the light of other Pennsylvania law of general application, in effect at the time of the trial court's decision, which strongly suggests a Pennsylvania law expectation that certain sentences will be served in an institution in the county where the conviction took place. E. g., Pa.Stat.Ann. tit. 19, § 891.[3] The place of confinement for prisoners who should be sentenced to confinement in county institutions is a substantive matter under Pennsylvania law. See, e. g., Commonwealth ex rel. Dennis v. Ashe, 161 Pa.Super. 540, 55 A.2d 433 (1947) (per curiam) (simple imprisonment requires confinement in county jail, not in penitentiary). Thus a rather strong case can be made for the existence of a Pennsylvania law expectation as to the place of serving some sentences.
 
 
 45
 Section 636, however, does not stand alone. It must be read in light of the subsequently enacted section 72, which provides in relevant part:
 
 
 46
 The Deputy Commissioner for Treatment of the Bureau of Correction ... is hereby authorized ... upon petition being presented to him by ... the superintendent in charge of any ... prison ... located within any county, setting forth that the said ... prison ... cannot, by reason of overcrowded condition or other existing conditions, furnish proper and sufficient accommodations for the care, custody, control, and safety of the inmates thereof, and that it is requested that a certain number of inmates ... be transferred therefrom, may make an order authorizing and directing the ... superintendent ... to transfer to another prison ... such person or persons whom the ... superintendent or official in charge, shall specify and designate: Provided, however, That before any transfer is made as aforesaid the court of common pleas of the county wherein any such ... prison ... is located, shall give its consent to such transfer.
 
 
 47
 Pa.Stat.Ann. tit. 61, § 72 (Purdon 1964 & Supp.1979) (emphasis added). Section 72 is the statute that we considered in Cobb v. Aytch, 539 F.2d 297 (3d Cir. 1976), cert. denied, 429 U.S. 1103, 97 S.Ct. 1130, 51 L.Ed.2d 554 (1977). See also Mack v. Johnson, 430 F.Supp. 1139, 1148 (E.D.Pa.1977), (§ 72 authorization to transfer between state facilities), aff'd mem., 582 F.2d 1275 (3d Cir. 1978). We vacated the consent decree in Cobb v. Aytch because it interfered with the discretion of Superintendent Aytch to request transfers. Plainly, section 72 precludes the argument that section 636 gives Philadelphia sentenced prisoners a state law expectation that they can never be transferred. E. g., Commonwealth ex rel. Bozzi v. Myers, 186 Pa.Super. 42, 44-45, 140 A.2d 375, 376 (1958) (per curiam); Commonwealth ex rel. Radziewicz v. Burke, 169 Pa.Super. 263, 267-68, 82 A.2d 252, 254 (1951). But neither Cobb v. Aytch nor any other case, state or federal, has definitively resolved the narrower question whether, reading the two statutes together, there is a state law expectation to remain in Philadelphia unless the conditions referred to in section 72 are established to the satisfaction of the Court of Common Pleas.
 
 
 48
 The district court, focusing on the "other existing conditions" language in section 72, concluded that the discretion to be exercised by Superintendent Aytch and by the Deputy Commissioner for Treatment was absolute. That being the case, the court found no state law expectation to remain in Philadelphia. However, this is hardly a necessary reading of the statute. The "other existing conditions" language is qualified by the surrounding words "cannot ... furnish proper and sufficient accommodations for the care, custody, control, and safety of the inmates." Arguably the "other existing conditions" must bear upon the ability of the institution to furnish care, custody, control or safety. The district court relied on Commonwealth ex rel. Radziewicz v. Burke, 169 Pa.Super. 263, 82 A.2d 252 (1951), to support its unfettered discretion conclusion. That case, however, does not go so far, for it held only that "other existing conditions" included prisoner misbehavior which bore upon the capability of the county prison to furnish care, custody, control and safety. Id. at 268, 82 A.2d at 255. The Pennsylvania caselaw dealing with section 72 is at best inconclusive.
 
 
 49
 Section 72 originated in Act of July 11, 1923, P.L. 1044, No. 425, which for the first time authorized transfer of sentenced offenders from county institutions. It originally required transfer to an institution within the same county, "save in such cases where such county shall not have sufficient accommodation for the care, custody, and control of such prisoner, in which event said petition for transfer shall specify the institution in the county nearest to the county in which the prisoner is confined...." Id. at P.L. 1045. That Act required a petition to and action by the court of quarter sessions of the county of confinement. It was silent as to whether the court of quarter sessions might act ex parte, but the quoted language confirms that Pennsylvania policy was that sentenced prisoners not be transferred to remote places of confinement. That policy tends to suggest that the sentenced prisoner was entitled to respond to the petition. In 1929, however, the Act of July 11, 1923, No. 425, was amended in three respects. Act of April 23, 1929, P.L. 640, No. 270. Section 1 was amended to provide that the petition to transfer be presented to the Department of Welfare of the Commonwealth, and the role of the court of quarter sessions was reduced from initially authorizing to merely consenting to transfers. Section 1 was also amended to eliminate the above-quoted language requiring that prisoners sentenced to county institutions be transferred no further than the next nearest county. Id. at P.L. 640-41. A new section was added, authorizing transfers, but not initial commitment, to the Central State Penitentiary at Rockview, a state facility. Id. No. 270, § 4, P.L. 642 (adding § 6). Again the Act was silent as to whether the sentenced prisoner might respond to the petition filed with the Department of Welfare or whether the court of quarter sessions could act ex parte in granting its consent. Indeed it is not clear from the text of the Act what interest was intended to be protected by the requirement of court consent. Apparently it was not the convenience of the court in scheduling trials, since, like the 1923 Act, the 1929 Act apparently applied only to sentenced inmates. In 1965, the 1923 Act was further amended to make clear that the amended transfer provisions were applicable not only to sentenced prisoners, but also to those convicted and awaiting sentence, those awaiting trial, and those confined for any other purpose. Act of Dec. 22, 1965, P.L. 1184, No. 470. Under the 1965 amendment, transfers of prisoners awaiting trial required their consent. The most recent amendment of the 1923 statute, however, eliminated this provision that prisoners awaiting trial could not be transferred without their consent. Act of July 10, 1969, P.L. 150, No. 60.
 
 
 50
 It appears, therefore, that at the time the trial court acted, while Pennsylvania prisoners had some state law expectation as to the institutions to which they might initially be sentenced, the 1923 Act eliminated the original prohibition against transfers out of the city, and the 1929 amendment eliminated both the expectation that they would not be transferred to a state penitentiary and the expectation that they would not be transferred to a remote location. The amended section 72 still requires consent of a court, now the Court of Common Pleas. What the purpose of that requirement is remains obscure. Clearly the court has an interest in the location of untried and unsentenced inmates, but the court consent requirement has merely been carried forward since 1929, when only sentenced prisoners could be transferred. Possibly it was designed to protect the fisc of the governmental unit to which transfers might be made. But whatever its purpose, the consent provision does not appear to have been intended to protect prisoner expectations with respect to the distance of transfer, since those expectations were substantially eliminated by the 1929 amendments. Both as originally enacted and as currently codified, section 72 provides that transfers are permitted when the transferring institution "cannot, by reason of overcrowded condition or other existing conditions, furnish proper and sufficient accommodations for the care, custody, control, and safety of the inmates thereof." Pa.Stat.Ann. tit. 61, § 72. Given the foregoing legislative history, we conclude that the trial court did not err in holding that the quoted language creates no state law expectation that absent such inability, and except on such conditions, no transfer will take place. Absent a state law expectation sentenced prisoners have no due process protection with respect to the place of serving their sentences.
 
 
 51
 One other Pennsylvania statute, 61 P.S. § 331.17 is worthy of note. This statute defines the powers of the Pennsylvania Parole Board, but in a proviso preserves the power of sentencing courts to grant parole of persons sentenced for maximum period of less than two years.[4] It was once the case that most persons sentenced for less than two years served their sentences in county penal institutions, although we are advised that in some parts of Pennsylvania that is no longer the practice. If transfer out of those institutions were to eliminate the power of the sentencing judge to grant parole, that state law expectation would require due process protection. It seems clear on the face of section 331.17, however, that the length of sentence, not the place of confinement, determines the parole power of the sentencing judge, and we have found no Pennsylvania regulations or cases suggesting otherwise. Cf. Commonwealth v. Yoder, 249 Pa.Super. 389, 378 A.2d 351 (Pa.Super.1977). Thus this section also appears not to afford any state law expectation as to place of confinement.
 
 
 52
 We agree with the trial court, therefore, that since there is no state law expectation respecting the place of serving sentence, there is no basis on which injunctive relief against transfers can be granted in favor of sentenced inmates.
 
 V.
 
 53
 Transfers of prisoners who are being held pending trial present us with legal questions different from those posed by sentenced or convicted inmates. Their state law entitlement to remain in Philadelphia cannot rest on any expectation as to the place of serving sentence. Since the trial judge found no state law expectation at all as to place of confinement he did not, in disposing of the claims of pretrial detainees, rely on state law, but instead addressed their claim that federally protected rights were adversely affected.
 
 
 54
 The trial court observed, and we agree, that pretrial detainees have federally protected liberty interests that are different in kind from those of sentenced inmates. Unlike sentenced prisoners, who under Meachum v. Fano, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), and Montanye v. Haymes, 427 U.S. 236, 96 S.Ct. 2593, 49 L.Ed.2d 466 (1976), must look to state law for the protection of their personal liberties, pretrial detainees have liberty interests firmly grounded in federal constitutional law.
 
 
 55
 Pretrial detainees are restrained only as a means to ensure their eventual presence at trial and sentencing. Norris v. Frame, 585 F.2d 1183, 1187-88 (3d Cir. 1978); United States ex rel. Tyrrell v. Speaker, 535 F.2d 823, 827 (3d Cir. 1976); see A. Highmore, Jr., A Digest of the Doctrine of Bail in Civil and Criminal Cases 192 (1783). Thus they retain several constitutionally protected liberty interests relevant to the conditions of their confinement that are not fully available to sentenced inmates. First, pretrial detainees have a constitutionally protected right to the effective assistance of counsel. This sixth amendment right attaches at the initiation of criminal proceedings, Kirby v. Illinois, 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972); see Brewer v. Williams, 430 U.S. 387, 398-99, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977) (stressing importance of protecting right to counsel at pretrial stages), and continues through sentencing. Mempa v. Rhay, 389 U.S. 128, 134-37, 88 S.Ct. 254, 256-58, 19 L.Ed.2d 236 (1967). We have already noted the trial court's extensive findings on the effect of the transfers on pretrial detainees' access to legal representation, and the consequent infringement on their exercise of their right to counsel, as protected by the sixth and fourteenth amendments. We agree with the district court that the transfers of pretrial detainees, at a minimum, significantly interfered with their access to counsel.
 
 
 56
 We note, however, that the pretrial detainees enjoy the benefits of other constitutionally protected liberty interests which were infringed upon by the transfers of those inmates to distant state facilities. These interests include the right to a speedy trial guaranteed by the sixth amendment. This constitutionally protected right was originally derived directly from bills of rights adopted in Massachusetts and Virginia even prior to the adoption of our constitution.[5] It is, however, of much more ancient lineage, having originated in ancient British statutes regarded at the time of adoption of our federal Bill of Rights as a part of our inherited common law of personal liberty.[6]
 
 
 57
 Thus the sixth amendment's speedy trial clause, which was derived from the most ancient guarantees of fundamental rights, prevents lengthy periods of detention that unnecessarily interfere with those liberty interests enjoyed by the accused. Chief Justice Warren recognized the ancient underpinnings of this fundamental right to speedy trial. In Klopfer v. North Carolina, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967), in which the speedy trial clause was applied to the states, the Chief Justice wrote:
 
 
 58
 That right has its roots at the very foundation of our English law heritage.... By the late thirteenth century, justices, armed with commissions of gaol delivery and/or oyer and terminer were visiting the countryside three times a year. These Justices, Sir Edward Coke wrote in Part II of his Institutes, "have not suffered the prisoner to be long detained, but at their next coming have given the prisoner full and speedy justice, ... without detaining him long in prison." To Coke, prolonged detention without trial would have been contrary to the law and custom of England; but he also believed that the delay in trial, by itself, would be an improper denial of justice.
 
 
 59
 Coke's Institutes were read in the American Colonies by virtually every student of law.... To Coke, in turn, Magna Carta was one of the fundamental bases of English liberty. Thus, it is not surprising that when George Mason drafted the first of the colonial bills of rights, he set forth a principle of Magna Carta, using phraseology similar to that of Coke's explication: "(I)n all capital or criminal prosecutions," the Virginia Declaration of Rights of 1776 provided, "a man hath a right ... to a speedy trial...." That this right was considered fundamental at this early period in our history is evidenced by its guarantee in the constitutions of several of the States of the new nation, as well as by its prominent position in the Sixth Amendment. Today, each of the 50 States guarantees the right to a speedy trial to its citizens.
 
 
 60
 The history of the right to a speedy trial and its reception in this country clearly establish that it is one of the most basic rights preserved by our Constitution.
 
 
 61
 Klopfer v. North Carolina, 386 U.S. 213, 223-26, 87 S.Ct. 988, 993-95, 18 L.Ed.2d 1 (1967) (footnotes omitted). The speedy trial clause, recognized by the Supreme Court as "one of the most basic" constitutional rights, was designed to minimize interference with personal liberty prior to trial. By ensuring a speedy trial, the framers of the Bill of Rights, like the framers of the ancient British statutes, intended to reduce the period of time during which an individual could be incarcerated without having been found guilty. The clause thus implies that the least drastic length of confinement be imposed prior to an adjudication of guilt.[7]
 
 
 62
 The trial court's findings of fact implicate the federal liberty interests referred to. We noted above the substantial interference with the right to effective assistance of counsel resulting from pretrial transfer to distant places. We noted, as well, the prolongation of pretrial detention which resulted from those transfers. The practice of transferring unsentenced inmates seriously impinged upon their personal liberty as protected by the speedy trial clause not only by prolongation of detention, but also by removing defendants from proximity to potential witnesses. The drastic reduction in visits by family and friends which the trial court found to be the result of the transfers obviously curtailed the ability of the defendants to communicate with potential witnesses through those most likely to be willing to assist. And, while the transfers interfered with what the prisoners could do to help themselves, they interfered even more drastically with what counsel might have been able to do for them. Most inmates transferred in 1973 and represented by the Defender Association were deprived of pretrial interviews. The trial court concluded "that in most instances a transfer would violate the pretrial detainee's due process rights and subject him or her to serious harm such as not being able to prepare a criminal defense. Under these circumstances, where an adequate remedy at law would be lacking, it seems appropriate to enjoin future transfers without consent of pretrial detainees, unless and until defendants can present a change in circumstances that would justify subjecting untried inmates to the burdens described above." 472 F.Supp. at 928.
 
 
 63
 In the district court the defendants urged that because it was the Commonwealth's present policy, as reflected in the July 24, 1977 memorandum, not to accept transfer of unwilling pretrial detainees, injunctive relief was inappropriate. The court found, however, that this policy had not been embodied in any regulation of the Bureau of Corrections, and that the Philadelphia defendants, who opposed the earlier consent decree, desired to continue the practice of unconsented transfers. Thus, the court concluded, the threat of transferring pretrial detainees without notice or opportunity to be heard continued. Id. Therefore the court issued an injunction which forbade transfers of pretrial detainees without their written consent.
 
 
 64
 We can understand why the court opted for this form of injunctive relief. The requirement of consent is completely consistent with the policy of the Commonwealth embodied in the July 24, 1977 memorandum, and that policy gives maximum protection to the sixth amendment interests of pretrial detainees. Conforming relief to the existing Commonwealth practice probably appeared to the court a reasonable course, especially given its findings of fact establishing that in each Philadelphia place of confinement there are maximum security facilities. On the other hand, as we noted above, the existing Commonwealth policy of requiring consent may be changed. Moreover, it is not possible to anticipate all the security problems which may in the future confront the administrators of the city prisons. The requirement of written consent gives each pretrial detainee a veto on transfer even if the Commonwealth should change its policy, and even if a temporary transfer would not seriously affect his sixth amendment rights. Thus we conclude that while injunctive relief in favor of the untried detainees was proper, the form of that relief should be modified. Consent as a basis for transfer is certainly proper. But the injunction should provide that in the absence of consent a transfer may not ordinarily be made until the untried defendant has received notice of the proposed transfer and an opportunity to be heard in a Pennsylvania tribunal independent of the prison system in opposition to it. The injunction should, however, recognize that emergency situations may arise involving the security of the institution in which transfers prior to hearing must be permitted. For those cases a prompt post-transfer hearing in a Pennsylvania tribunal independent of the prison system is an appropriate accommodation between the federal liberty interests of the defendant and the emergency security concerns of the county prisons. The obviously appropriate Pennsylvania tribunal is the Court of Common Pleas, the consent of which is required under section 72 in any event. Since the defendants may on remand suggest a more appropriate tribunal, we leave the formulation of a precise order to the district court in the first instance. We do not hold that the opportunity to be heard requires an evidentiary hearing, for in our view the pretrial detainee can be adequately heard by pleadings. As to the content of the notice, it need only state in general terms the reason for the proposed transfer, so that the independent tribunal may weigh that reason against the degree of interference with the federally protected rights on which the detainee relies. The minimum requirement of notice and an opportunity to be heard in opposition to transfer, or a prompt post-transfer hearing in cases of emergency transfers, will in our view adequately safeguard the federally protected liberty interests of the pretrial detainees, without disturbing the continued operation of the more protective policy embodied in the Commonwealth's July 24, 1977 memorandum.
 
 
 65
 The Philadelphia defendants and the Commonwealth defendants contend that although relief for the pretrial detainees may have been authorized by the governing case law at the time the trial court acted, the subsequent decision of the Supreme Court in Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), requires a reversal. They would have us read Justice Rehnquist's majority opinion as a more or less total repudiation of all the traditions of liberty with respect to pretrial detainees which have been a part of our legal tradition since before the seventeenth century. That reading of Bell v. Wolfish ignores the very narrow issues with which the Court dealt in that case.[8] The case dealt with no more than the extent to which the government may, in a detention facility in which a pretrial detainee may validly be detained, in the interest of security adopt reasonable restrictions on inmate activity. Indeed, Justice Rehnquist stated that the issue in Bell was "when an aspect of pretrial detention that is not alleged to violate any express guarantee of the constitution is challenged, (whether the court finds a violation of) the detainee's rights to be free from punishment." Id. at 534, 99 S.Ct. at 1872. The court then noted that "if a particular condition or restriction of pretrial detention is reasonably related to legitimate governmental objective, it does not, without more, amount to 'punishment'." Id. at 539, 99 S.Ct. at 1874. It also held that a rule permitting room searches in the institution out of the presence of the regular occupant, and a rule permitting body cavity searches did not, when balanced against legitimate governmental interests in security, violate the fourth amendment. Id. at 557, 560, 99 S.Ct. at 1883-1885. Finally, the Court rejected a challenge, based on the first amendment, to prison rule restricting receipt of hard-covered publications to those sent from publishers or book clubs. Id. at 548-52, 99 S.Ct. at 1879-81. In this case we are not dealing with the infliction of punishment, for the trial court's factual determinations excluded any punitive motive. Nor are we dealing with the fourth amendment, for no fourth amendment contention was advanced. Nor do we rely on a first amendment contention. The case before us involves issues which Bell v. Wolfish simply did not address: federal sixth amendment rights. Bell v. Wolfish is not dispositive of those issues, and does not require a reversal of the order protecting a pretrial detainee from transfer to a distant place on ex parte orders. Therefore, we must affirm the district court's decision to grant injunctive relief against transfer of pretrial detainees except to the extent we have suggested a modification in the scope of the injunction.
 
 VI.
 
 66
 The trial judge, in fashioning relief, drew a distinction between pretrial detainees and convicted but unsentenced inmates. He concluded that "the conviction alone appears to extinguish any 'liberty' interest formally derived from the fourteenth amendment." We disagree. The right to remain at liberty continues until a court pronounces a judgment of sentence, although after a jury has pronounced a guilty verdict the court may insist upon greater assurance that a defendant will submit to sentence. It is, in the words of the Supreme Court, a right "conditioned upon the accused's giving adequate assurance that he will stand trial and submit to sentence if found guilty." Stack v. Boyle, 342 U.S. 1, 5, 72 S.Ct. 1, 3, 96 L.Ed. 3 (1951).[9] Pennsylvania law also recognizes that unsentenced defendants have a right to bail similar in scope to that enjoyed by unconvicted persons. Pa.R.Crim.P. 4010A (1979). Moreover unsentenced inmates retain important sixth amendment rights to speedy trial and effective assistance of counsel. It would be a strained construction of the speedy trial clause to hold that it protected the right to a prompt trial but permitted indefinite postponement of sentencing of a defendant unable to make bail. Most significantly, however, sentencing is a critical stage of a criminal proceeding to which the sixth amendment's guarantee of the effective assistance of counsel applies. Mempa v. Rhay, 389 U.S. 128, 134-35, 88 S.Ct. 254, 256-57, 19 L.Ed.2d 236 (1967); Townsend v. Burke, 334 U.S. 736, 740-41, 68 S.Ct. 1252, 1255, 92 L.Ed. 1690 (1948).
 
 
 67
 There is, however, the trial court's finding that while it is essential for attorneys to interview their clients at the post-trial stage in order to prepare for sentencing, "it is possible to conduct (such interviews) immediately after the defendant is convicted or enters his plea and prior to the inmate's return to prison." 472 F.Supp. at 916. The Defender Association of Philadelphia, as amicus curiae, vigorously contests the adequacy of that extremely limited opportunity for consultation. It observes:The availability of the defendant to his attorney before sentencing is also important for reasons other than the need to prepare a sentencing presentation. Under Pennsylvania's Rules of Criminal Procedure, all legal challenges to the validity of a guilty verdict must be raised in post-trial motions submitted prior to sentence, or they are waived for purposes of appeal, Pa.R.Crim.Pro. 1123, Commonwealth v. Clair, 458 Pa. 418, 326 A.2d 272 (1974). Formulating post-trial motions may in some instances require consultation between client and counsel, especially where they involve factual questions and hearings, as for example, where there is a claim of newly discovered evidence, Pa.R.Crim.Pro. 1123(d), or, where trial counsel has been replaced between adjudication and sentencing, one of ineffectiveness of trial counsel. See Commonwealth v. Hubbard, 472 Pa. 259, 372 A.2d 687 (1977) ((claims of ineffective assistance by trial counsel waived if new counsel fails to raise them at post-trial motions)). Finally, should the defendant decide before sentencing that he or she wishes to withdraw a plea of guilty, it will be necessary for him or her to consult with the defense attorney, perhaps at great length. See Pa.R.Crim.Pro. 320. In Pennsylvania, delaying such a motion to withdraw until after sentencing substantially lessens the likelihood of its being granted. See Commonwealth v. Champion, --- Pa.Super. ---, 407 A.2d 760 (1979) ((plea withdrawal should be freely permitted pre-sentence for any fair and just reason)), and compare Commonwealth v. Rosmon, 477 Pa. 540, 384 A.2d 1221 (1978) ((post-sentence motion to withdraw guilty plea to be granted only when necessary to correct manifest injustice)).
 
 
 68
 Brief for Defender Association of Philadelphia as Amicus Curiae, 9-10. The trial court, proceeding on the mistaken legal assumption that convicted but unsentenced detainees had no federal liberty interests affected by their place of confinement, did not specifically address any of these concerns of the Defender Association. Because we conclude that these inmates' federal liberty interests are involved and thus there are ample legal grounds upon which relief could have been granted to the unsentenced but convicted defendants, to the extent that the order denied all relief for that subclass, it must be vacated, and the case remanded for further consideration of the appropriateness of some protection for these inmates against transfers. As in the case of pretrial detainees, we note that notice and an opportunity to be heard in the Court of Common Pleas would be at least an appropriate safeguard. That, however, is a matter for the district court in the first instance.
 
 VII.
 
 69
 The appellants also contend that the trial court erred in declining to award injunctive relief on their eighth amendment challenge to the constitutionality of conditions of confinement in the State Correctional Institution at Rockview. We find no abuse of discretion in refusing to enjoin conditions that no longer affect members of the plaintiff class.
 
 VIII.
 
 70
 The judgment appealed from will be affirmed insofar as it denied relief for the subclass consisting of sentenced inmates serving sentences in Philadelphia prisons; vacated insofar as it ordered that pretrial detainees in Philadelphia prisons can only be transferred with their written consent, and remanded for the entry of an order consistent with Part V hereof; and reversed insofar as it denied relief for convicted but unsentenced inmates in Philadelphia prisons, and remanded for the entry of an order consistent with Part VI hereof. In all other respects the judgment will be affirmed. The parties each will bear their own costs.
 
 
 71
 ADAMS, Circuit Judge, concurring, with whom GARTH, J., joins.
 
 
 72
 I concur in the result reached by the majority, and I join the opinion with the exception of footnote 7, which discusses the bail clause of the Eighth Amendment. The plaintiffs did not predicate their claims for relief on any supposed interference with the right to bail, nor did the district court have occasion to reflect upon the impact a transfer might have on a pretrial detainee's right to bail or ability to post bail. Accordingly, I believe it most appropriate to confine the resolution of this case to issues concretely implicated by the parties' contentions and the district court's findings.
 
 GARTH, Circuit Judge, concurring:
 
 73
 I agree with the majority opinion that sentenced and convicted prisoners have no expectation giving rise to a liberty interest under Pennsylvania law and that pretrial detainees and convicted but unsentenced prisoners may not have their sixth amendment right to counsel violated by transfers which impair their access to counsel. Thus, I concur in the result reached by the majority. My reason for writing separately, however, is to emphasize that the record in this case in no way implicates or calls for discussion or analysis of the eighth amendment's right to bail or the sixth amendment's right to a speedy trial.
 
 
 74
 The findings made by the district court do not involve or provide any support for a claim respecting the right to bail. It is for this reason that the majority opinion properly distinguishes between the majority of the court, who recognize that this case does not present any bail considerations, and those judges who feel otherwise. See majority opinion at p. 958, note 7. See also Judge Adams' concurring opinion. I have not joined in that footnote and its extensive eighth amendment discussion because I feel it is gratuitous. Such a constitutional analysis must be conducted when a record presents that issue. This record, however, does not. Thus, any discussion along these lines is dictum and has no bearing on what we have decided this day.
 
 
 75
 For these same reasons, I do not subscribe to the discussion regarding speedy trial considerations which appears in the majority opinion at 957 - 961. The only district court findings of fact which could even remotely bear upon this issue are Findings of Fact Nos. 42 and 43. I recite these findings again, even though they appear in the majority opinion. They read:
 
 
 76
 42. For various reasons, on several occasions, transferees missed court appearances and parole hearings when they were not returned to Philadelphia on time. In fact, during one eight to ten week period, 25% of the transferees' cases had to be continued because defendants were not brought to court. Due to continuances and the prolongation of the pretrial period, some inmates spent more time in pretrial incarceration than the eventual length of their sentence.
 
 
 77
 43. During the same period of time, inmates incarcerated in Philadelphia County prisons missed Philadelphia County court appearances in only 3 to 4 percent of their cases.
 
 
 78
 It is clear from an examination of these findings that the district court was not addressing any issue involving speedy trial. First, these findings dealing with missed court appearances, continuances, and prolongation of the pretrial period cannot, without more, form the predicate for a sixth amendment speedy trial claim. Second, if indeed that issue was a concern of the district court, it is evident that at some point, recognition would have had to be given to the Pennsylvania Speedy Trial Act, Rule 1100 of the Pennsylvania Rules of Criminal Procedure. Yet, no mention of that Act appears in the district court opinion.
 
 
 79
 The Pennsylvania Speedy Trial Act, which was adopted on June 8, 1973, and which contains explicit time limitations for bringing a defendant to trial, focuses on the date on which a written complaint is filed against the defendant and provides that trial is to commence 180 days from that date.[1] If the district court had intended to address speedy trial issues affecting Pennsylvania state prisoners, it is obvious that its findings would have been framed in terms of the particular dates when the written complaint was filed. Additionally, findings then would have been required as to whether, as a result of the transfers, the prisoners had been brought to trial beyond the prescribed time limits. Findings Nos. 42 and 43 reveal, however, that the district court made no findings concerning the dates on which written complaints were filed against any of the prisoners involved in this litigation. Nor did it make any findings with regard to the number of days that had passed, from the filing of the complaints, before the prisoners were brought to trial. Thus, notwithstanding whatever relevance Findings of Fact Nos. 42 and 43 may have as to the transfers generally, they do not impact in any way upon speedy trial considerations. Moreover, the record discloses no evidence from which findings pertaining to speedy trial considerations could be made.
 
 
 80
 I have no doubt that the district court would have made as explicit findings on this subject as those it made regarding access to counsel, had the issue been before it and had there been evidentiary support for such findings in the record. Thus, even apart from the propriety of considering federal constitutional guarantees before addressing the relevant provisions of Pennsylvania's enactments, it is evident that on this record a speedy trial analysis is unwarranted.
 
 
 81
 Accordingly, although I agree that the majority opinion is correct in its sixth amendment access to counsel analysis, I cannot subscribe to its discussion of constitutional speedy trial implications nor to its theoretical dissertation concerning bail. As I have stated, because these issues are not relevant to, or supported by, the record in this case, they should not be confused with the narrow constitutional holding of the court which involves only the sixth amendment's right to access to counsel.
 
 
 
 [1]
 Because of the finding that the transfers were not punitive, moreover, we need not consider whether Montanye v. Haymes, 427 U.S. 236, 92 S.Ct. 2413, 32 L.Ed.2d 677 (1976), would permit transfers to prisons imposing more onerous conditions of confinement in order to punish the Muslims for the murders of the warden and deputy warden
 
 
 [2]
 Act of March 30, 1831, P.L. 228, currently codified at Pa.Stat.Ann. tit. 61, § 621 note (Purdon 1964) (appended as historical note)
 
 
 [3]
 In view of the disposition we reach we need not determine what effect the Judiciary Act Repealer Act of 1978, P.L. 202 No. 53, reprinted in Pa.Stat.Ann. tit. 42, § 20002 (Purdon 1979) (unconsolidated statutes), has on the prior law with respect to confinement in county institutions
 
 
 [4]
 The board shall have exclusive power to parole and reparole, commit and recommit for violations of parole, and to discharge from parole all persons heretofore or hereafter sentenced by any court in this Commonwealth to imprisonment in any prison or penal institution thereof, whether the same be a state or county penitentiary, prison or penal institution, as hereinafter provided. It is further provided that the board shall have exclusive power to supervise any person hereafter placed on probation or parole (when sentenced to a maximum period of less than two years) by any judge of a court having criminal jurisdiction, when the court may by special order direct supervision by the board, in which case the probation or such parole case shall be known as a special case and the authority of the board with regard thereto shall be the same as herein provided with regard to parole cases within one of the classifications above set forth: Provided, however, That the powers and duties herein conferred shall not extend to persons sentenced for a maximum period of less than two years, and nothing herein contained shall prevent any court of this Commonwealth from paroling any person sentenced by it for a maximum period of less than two years: And provided further, That the period of two years herein referred to shall mean the entire continuous term of sentence to which a person is subject, whether the same be by one or more sentence, either to simple imprisonment or to an indeterminate imprisonment at hard labor, as now or hereafter authorized by law to be imposed for criminal offenses. The power of the board to parole shall extend to prisoners sentenced to definite or flat sentences. 1941, Aug. 6, P.L. 861, § 17; 1943, May 27, P.L. 767, § 8 (emphasis added)
 
 
 [5]
 The Virginia Bill of Rights thus contained a speedy trial clause. Virginia Bill of Rights § 8 ("in all capital or criminal prosecutions a man hath a right ... to a speedy trial"), reprinted in Documents of Am. History at 104 (3d ed. 1946) (edited by H.S. Commager) (hereinafter Documents of Am. History). Although not adopting the precise phrase "speedy trial," the Massachusetts Bill of Rights provided that, as to "all injuries or wrongs which (a citizen) may receive in his person, property, or character," there should be a remedy available "promptly." Mass. Bill of Rights art. XI, reprinted in Documents of Am. History at 108
 
 
 [6]
 The sixth amendment's speedy trial guarantee, has been traced as far back as the Assize of Clarendon in 1166, which stated in relevant part
 
 
 [4]
 And when a robber or murderer or thief or receiver of them has been arrested through the aforesaid oath, if the justices are not about to come speedily enough into the country where they have been taken, let the sheriffs send word to the nearest justice by some well-informed person that they have arrested such men, and the justices shall send back word to the sheriffs informing them where they desire the men to be brought before them; and let the sheriffs bring them before the justices
 
 
 [2]
 English Historical Documents 408 (1953), quoted in Klopfer v. North Carolina, 386 U.S. 213, 223 n.9, 87 S.Ct. 988, 993 n.9, 18 L.Ed.2d 1 (1967). Moreover, the right to a speedy trial was guaranteed in the Magna Carta in which it is stated that "we will not deny or defer to any man either justice or right." Magna Carta, c. 29 (King John's Charter of 1215, c. 40) (1225), quoted in Klopfer v. North Carolina, 386 U.S. at 223, 87 S.Ct. at 993 (1967)
 
 
 [7]
 The author of this opinion and Judges Aldisert and Higginbotham believe that the right to counsel and speedy trial clauses must be read together with the bail clause of the eighth amendment to create federally protected interest in reducing pretrial incarceration and minimizing interference with a pretrial detainee's liberty. All those clauses were derived from ancient British statutes directed to that end. The bail clause traces its origins back through the English Bill of Rights of 1688 and Habeas Corpus Act of 1679 to the Magna Carta. The English Declaration of Rights, which was subsequently enacted as the Bill of Rights of 1688, was Parliament's answer to James II's numerous abuses of the criminal justice system. When Parliament offered the English throne to William of Orange and Mary, James II's daughter, their coronation was conditioned upon their acceptance of the Bill of Rights, which provided, in relevant part, that because excessive bail had been required as a means of preventing pretrial release,
 
 
 [10]
 That excessive bail ought not to be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted
 Bill of Rights, 1 W. & M. st. 2, c. 2, preamble, clause 10; id. rights, clause 10 (1689).
 The provision ultimately derives from the 39th chapter of the Magna Carta, which required that "no freeman shall be arrested, or detained in prison ... unless ... by the law of the land." See Foote, The Coming Const. Crisis in Bail, 113 U.Pa.L.Rev. 959, 965-66 (1965) (quoting Magna Carta). In order to give content to this due process requirement, and to prevent abuses of individuals' right to bail, Parliament enacted the Habeas Corpus Act of 1679. See id. at 966-67; 9 Holdsworth, A History of English Law 118-19 (2d ed. 1938) (origins of Habeas Corpus Act) (hereinafter Holdsworth). The King's subsequently adopted practice of appointing judges who would circumvent the Habeas Corpus Act by requiring the posting of excessive bail and thus, denying pretrial release, see 9 Holdsworth at 118-19, ultimately led to the King's downfall in the Glorious Revolution, the inclusion of the excessive bail clause in the Bill of Rights, and the subsequent enactment of the Bill of Rights when William and Mary assumed the throne. See id.; C. Lovell, English Const. and Legal History, 388-94 (1962) (describing historical background); Foote, The Coming Constitutional Crisis in Bail, 113 U.Pa.L.Rev. at 967-68.
 Both the Massachusetts and Virginia bills of rights also prohibited excessive bail. Virginia Bill of Rights § 9 (1776) ("excessive bail ought not to be required"), reprinted in Documents of Am. History at 104; Massachusetts Bill of Rights art. XXVI (1780) ("no magistrate or court of law shall demand excessive bail or sureties"), reprinted in Documents of Am. History at 109. The Massachusetts provision, although ultimately derived from English statutes, see note 6 infra, may trace its roots through the 1641 Massachusetts Body of Liberties, section 18 of which provided in part that:
 no mans person shall be restrained or imprisoned by any Authority what so ever, before the law hath sentenced him thereto, If he can put in sufficient securities, bayle, or mainprise, for his appearance, and good behavior in the meane time ...
 Massachusetts Body of Liberties § 18 (1641), quoted in Foote, The Coming Constitutional Crisis in Bail, 113 U.Pa.L.Rev. at 975 (1965). The inclusion of these provisions in early state bills of rights is indicative of the intent of the framers of the federal Bill of Rights.
 The rights guaranteed in the speedy trial and bail clauses of our own Bill of Rights are therefore derived from the most ancient and fundamental declaration of the rights of citizens. These rights and the protections which our Bill of Rights was intended to embody as adopted into our Constitution cannot be understood or interpreted outside their historical context. Moreover, it is clear that their inclusion in our Bill of Rights was intended to secure to American citizens the entire content of those clauses as contained in the British law and understood by our Founding Fathers. See A. Howard, The Road From Runnymede, 205-10, 233, 248-49 (1968) (tracing Bill of Rights through Virginia Declaration by George Mason to Glorious Revolution and Magna Carta); 3 Elliot's Debates in the Several State Conventions on the Adoption of the Federal Constitution 446-47 (1836) (statement of Patrick Henry to Virginia Convention) (hereinafter Elliot's Debates); 3 Elliot's Debates at 467-68 (statement of Governor Randolph to Virginia Convention).
 Our analysis is also supported by the Habeas Corpus Act of 1679, adopted by Parliament in another attempt to end the King's abuses of his trial and incarceration powers and from which the clauses were brought forth. Two abusive practices are directly relevant: arrest and imprisonment without redress; and imprisonment at a great distance from one's home. As to the first, the Act imposed time limits on courts or judges presented with petitions for writs of habeas corpus. See 9 Holdsworth at 118 (summarizing provisions of English Habeas Corpus Act of 1679). As to the other abuse, the King's practice of incarceration of individuals at great distances from their homes, section nine of the Habeas Corpus Act provided: "No persons are allowed to alter a prisoner's place of confinement, except in certain specific cases defined by the Act." 31 Car. II, c. 2, § 9 (1679); see 9 Holdsworth at 118. Moreover, the Act prohibited ordering "prisoners (to) be sent to Scotland, Ireland, or parts beyond the seas." 31 Car. II, c. 2, § 12; see 9 Holdsworth at 118. Holdsworth includes in his list of the King's abuses the following:
 persons were kept in prison a long time without trial ... persons arrested ... found it difficult to get release on bail ... (and) it was one of the articles of Clarendon's impeachment that he 'procured divers of his majesty's subjects to be imprisoned against law in remote islands, garrisons, and other places, thereby to prevent them from benefit of the law.
 
 
 [6]
 Holdsworth at 214 & n.2 (emphasis added). Thus, the idea that distance alone may deprive one of the constitutionally protected liberties is well grounded in the ancient underpinnings of our laws and constitution. Consistent with contemporary commitment to the personal liberties protected by the ancient British statutes, the eighth amendment was actually anticipated not only in the Massachusetts and Virginia bills of rights, but in the Judiciary Act of 1789, ch. 20, § 33, 1 Stat. 73, 91 (bail shall be admitted, except in capital cases in which bail is discretionary with certain judicial officers), as well as in Article 2 of the Northwest Ordinance, as adopted by the Continental Congress on July 13, 1787 and by the First and Fifth Congress ("All persons shall be bailable, unless for capital offences where the proof should be evident or the presumption great"). 1 Stat. at Large 52; 1 Stat. at Large 550. As the Supreme Court held in Stack v. Boyle, 342 U.S. 1, 72 S.Ct. 1, 96 L.Ed. 3 (1951),
 federal law has unequivocally provided that a person arrested for a non- capital offense shall be admitted to bail. This traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction ... Unless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning.
 Since the function of bail is limited, the fixing of bail for any individual defendant must be based upon standards relevant to the purpose of assuring the presence of that defendant.
 Id. at 4-5, 72 S.Ct. at 3 (citations omitted). Since the eighth amendment's prohibition against excessive bail bears plainly and directly upon the ability of charged persons to prepare for trial, and upon the presumption of a right to be free from restraint which those persons enjoy, it should also be read as preventing not merely the fact of detention, but also those forms of detention that unnecessarily interfere with those liberty interests. Moreover, the federal statute that governs bail also requires the consideration and imposition of conditions short of confinement which will ensure the appearance of a person for trial. Bail Reform Act of 1966, § 3, 18 U.S.C. § 3164 (1976).
 The interaction between pretrial incarceration and speedy trial and thus between the rights guaranteed by the sixth and eighth amendments, was noted by Justice Powell in Barker v. Wingo, 407 U.S. 514, 520, 92 S.Ct. 2182, 2187, 33 L.Ed.2d 101 (1972). Read together, the rights protected by these amendments support our alternative analysis, imposing an affirmative obligation on the states to minimize interference with a pretrial detainee's liberty.
 
 
 [8]
 Bell did not deal with relief which the district court had granted respecting "classification of inmates and movement between units; length of confinement; law library facilities; the commissary; use of personal typewriters; social and attorney visits; telephone service; inspection of inmates' mail; inmate uniforms; availability of exercise for inmates in administrative detention; food services; access to the bathroom in the visiting area; special diets for Muslim inmates; and women's 'lock in.' " 441 U.S. at 529 n.10, 99 S.Ct. 1868
 
 
 [9]
 The district court's reliance on Meachum v. Fano, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), is thus misplaced. Although the Supreme Court there did use the term "convicted" the context makes it clear that the Court was referring to defendants who were both convicted and sentenced. No unsentenced inmates were before the Court in Meachum
 
 
 [1]
 That statute provides, in pertinent part:
 Rule 1100. Prompt Trial
 (a)(1) Trial in a court case in which a written complaint is filed against the defendant after June 30, 1973 but before July 1, 1974 shall commence no later than two hundred seventy (270) days from the date on which the complaint is filed.
 (2) Trial in a court case in which a written complaint is filed against the defendant after June 30, 1974 shall commence no later than one hundred eighty (180) days from the date on which the complaint is filed.